IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Florida Evergreen Foliage and Louis Chang,

                              Plaintiffs,

vs.

E.I. DUPONT DE NEMOURS AND COMPANY, a
Delaware corporation,

                              Defendant.

CIVIL ACTION
NO. 1 98-CV-**93-2242**

**COMPLAINT**
(Jury Trial Demanded)



COMPLAINT FOR FRAUD, RACKETEERING,
CONSPIRACY, MISREPRESENTATION, ABUSE OF PROCESS,
INFLICTION OF EMOTIONAL DISTRESS, INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE,
NEGLIGENCE, SPOLIATION OF EVIDENCE and PUNITIVE DAMAGES

Plaintiffs allege against Defendants, jointly and severally, as follows:

INTRODUCTION

1.  This is a fraud case. It is brought by a Florida nurseryman and his/her business, in
connection with a continuing scheme devised, conducted, and/or participated in by Defendant
E.I. du PONT de NEMOURS AND COMPANY (hereinafter DUPONT), and others, to defraud
those who suffered damages as a result of using DUPONT's product, Benlate.  Defendant
engaged in a pattern of racketeering activity, and conspired to wrongfully and unlawfully prevent
Benlate claimants, such as the Plaintiffs herein, from learning the true facts, and thereby cause
Benlate claimants, such as the Plaintiffs herein, to settle their Benlate claims for less than their
true value, all to the detriment of the Plaintiffs.

2. DUPONT's racketeering scheme particularly impacted the Plaintiffs because their attorneys at Sheehe & Vendiltilli were handling their case along with many others, and was in contact with other Benlate plaintiffs' lawyers around the country and was monitoring other Benlate litigation in order to gain information. DUPONT knew of the involvement of plaintiffs' lawyers like Sheehe & Vendiltelli in other Benlate case, and therefore discovery produced by DUPONT in other cases other than Plaintiffs' case would have benefitted the Plaintiff.

3. To effectuate this scheme, Defendant engaged in a pattern of racketeering activity violating Title IX of The Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, Racketeer Influenced and Corrupt Organizations ("RICO"). It violated civil duties and criminal statutes as part of a nationwide scheme to defraud persons and businesses injured by Benlate.

4. Defendant employed such scheme, inter alia, in 1992 and 1993 in the Bush Ranch litigation (Bush Ranch v. DUPONT, No. 92-33-COL, United States District Court for the Middle District of Georgia, Columbus Division) before Judge J. Robert Elliott.

5. The fraudulent scheme was effectuated in part by knowingly using perjured, false and fraudulent testimony and affidavits to perpetrate fraud on the courts and plaintiffs involved in Benlate litigation, including Plaintiffs herein; making false statements themselves to Plaintiffs, juries, courts and the public; intentionally violating court discovery orders; intentionally and illegally concealing critical damaging evidence; intentionally misrepresenting the privileged status of documents to courts and plaintiffs; and intimidating witnesses adverse to DUPONT's position. These acts commenced on or before September 1991 and continue to the present, for the purpose of defeating or diminishing the claims of Benlate claimants, including Plaintiffs.

2

This conduct was implemented by mail fraud (18 U.S.C. Section 1341), wire fraud (18 U.S.C. Section 1343), witness tampering (18 U.S.C. Section 1512), and obstruction of justice (18 U.S.C. Section 1503) in numerous Benlate cases.

6.   In deciding that DUPONT and its attorneys, had committed discovery abuses unprecedented in the annals of American jurisprudence, Judge Elliott specifically stated: "Put in layperson's terms, DUPONT cheated.  And it cheated consciously, deliberately and with purpose.  DUPONT has committed a fraud on this Court...".  Opinion and Order, filed August 21, 1995, p. 73, Bush Ranch v. DUPONT, No. 92-33-COL, United States District Court for the Middle District of Georgia, Columbus Division; attached hereto as Exhibit "A".

7.   Judge Elliott found that DUPONT and its lawyers had made the Bush Ranch trial "a farce".  Id.

8.   In a related Benlate case, bearing upon the same issues, Judge Ronald Ibarra of the Third Circuit Court, State of Hawaii, found as a fact "...that DUPONT engaged in fraud and intentional misconduct which abused the judicial process.  DUPONT acted in bad faith, wantonly and for oppressive reasons."  Findings of Fact and Conclusions of Law, filed August 22, 1996, p.48, Kawamata v. United Agri Products et al., Civil No. 91-437, Circuit Court of the Third Circuit, State of Hawaii, attached hereto as Exhibit "B".

9.  The unprecedented nature of DUPONT's fraud was set out in stark terms by the Hawaii Supreme Court in its decision upholding Judge Ibarra's decision to sanction DUPONT for its conduct even thought the Kawamata/Tomono plaintiffs prevailed at trial.  In fact, DUPONT's conduct was so egregious that it created new  precedent so as to affirm Judge Ibarra's punishment of DUPONT:

In this case, considering the egregious nature of the fraud by DuPont, we construe the HRCP so as not to disallow a remedy under HRCP Rule 60(b)(3) when there is a post-judgment discovery of fraud supported by clear and convincing evidence. This interpretation of HRCP 60 (b)(3) departs from federal case law and sets s new precedent. However, the instant case presented an unusual, unique example of unprecedented discovery fraud perpetuated against the court. As a matter of equity, it would be unfair to allow DuPont to escape accountability for its fraud, misrepresentation, and misconduct, simply by virtue of the fact that the Plaintiffs had the good fortune to somehow overcome DuPont's discovery fraud and obtain a favorable jury verdict.

10.   In defaulting DUPONT for extreme misconduct in <u>Davis Tree Farms Inc. et al., v. DUPONT, et al.,</u> another Benlate case, Florida Circuit Court Judge Amy Donner found as a fact that "...DUPONT's destruction of evidence and refusal to comply with discovery requests to prove same, irreparably harmed plaintiffs in this matter, and demonstrates their complete disregard for the canons of ethics and the rules of discovery". <u>Davis Tree Farms, Inc., v. DUPONT,</u> Case No. 92-20006, Circuit Court, Dade County, Florida, (CA.23) at p.11. (After the Order became public, the <u>Davis Tree Farms</u> case and other cases involving the same attorneys settled, and in connection with the settlement, Judge Donner vacated and sealed this Order).

11.   These orders spell out some of DUPONT's deliberate withholding and/or destruction of evidence, deliberate false statements about that evidence by DUPONT and its lawyers, gross abuse of the discovery process, and use of perjured testimony regarding that evidence. All this was done for the purpose and with the intent of defrauding Plaintiffs and the courts, and depriving Plaintiffs of their right to recover fair compensation for the harm they had sustained due to Benlate. As a result of the continuing cover up, the fraud referred to herein was discovered by Plaintiffs herein only recently, within the past four (4) years.

12.   This Complaint also alleges common law claims under the laws of the State of

4

Florida for: (i) fraud by Defendant on the Plaintiffs, (ii) Intentional Nondisclosure of Material Fact, (iii) Fraudulent Inducement to Settle, (iv) Fraud on the Court, (v) Recission and Damages for Fraud, (vi) RICO, (vii) Conspiracy to violate RICO, (viii) Conspiracy, (ix) infliction of emotional distress, (x) interference with prospective economic advantage, (xi) abuse of process for the use of legal processes, including discovery tools, testimony and legal briefs, for improper and ulterior purposes, (xii) spoliation of evidence, and (xii) Florida Deceptive and Unfair Trade Practices.

13. The relief sought includes compensatory damages, punitive damages and treble damages arising from the scheme to defraud as set forth herein, equitable relief estopping DUPONT from asserting the releases and orders procured by fraud and/or misrepresentation, or alternatively, such other equitable relief as is deemed appropriate by the Court, prejudgment interest, costs of investigation and suit, and attorney's fees.

<u>JURISDICTION</u>

14. The jurisdiction of this Court over the subject matter of this action is predicated on 18 U.S.C. Section 1964 and 28 U.S.C. Sections 1331 and 1367. In addition, this Court has original jurisdiction under 28 U.S.C. Section 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

<u>VENUE</u>

15. Venue is proper in this District in that the Defendant is subject to personal jurisdiction in this District at the time the action is commenced, a substantial part of the events giving rise to the claims occurred in this District, the Defendant has transacted its business and affairs in this District, and the Defendant has committed tortious acts in this District.

5

## THE PARTIES

16.   Plaintiffs are and were at all times mentioned herein citizens and residents of the State of Florida with their principal places of business in the State of Florida.

17. E.I. DU PONT de NEMOURS AND COMPANY ("DUPONT") is a Delaware Corporation with its principal place of business in the State of Delaware.  DUPONT manufactures and distributes various pesticides for personal and professional use, including fungicides.  DUPONT distributes its products in all 50 states of the United States, and around the world.

18.  The individuals in Paragraphs 18-41 below are non- parties who are identified alphabetically here for convenient reference.

19. NICHOLAS ALBERGO, a co-conspirator and joint venturer with, and an agent of, DUPONT and ALSTON & BIRD, is an environmental engineer from Tampa, Florida, who testified falsely as an expert witness for DUPONT in Bush Ranch.

20. ALSTON & BIRD is a Georgia Partnership Including Professional Corporations, with its principal place of business in the State of Georgia.  ALSTON & BIRD served as counsel for DUPONT in several law suits stemming from allegations concerning DUPONT's fungicide, Benlate DF 50, including lawsuits in Florida.

21.  ALTA LABS is an analytical chemistry facility in El Dorado Hills, California hired by DUPONT to conduct soil and water analysis for sulfonylureas ("SU's"; described infra) in Benlate claimants' soils and waters.

22.  GLEN S. BALDWIN is an attorney, and Senior Counsel for DUPONT in Wilmington, Delaware.

6

23. ROBERT BETHEM is the master chemist at ALTA Labs and is the person primarily responsible for the SU testing conducted at ALTA Labs on Benlate claimants soils and water.

24. MORRIS A. BAILEY is a research scientist for DUPONT in Wilmington, Delaware. He is a member of the Benlate Resolution Team.

25. THOMAS A. BURKE is an attorney. and a partner at CABANISS BURKE & WAGNER in Orlando, Florida.  Mr. BURKE served at relevant times as DUPONT's national coordinating counsel for its Benlate litigation.

26. RICHARD CEFALO is an employee of WELKER PLANTS, INC., and was hired by DUPONT to conduct the Costa Rica field test.

27. CROWELL & MORING is a Washington D.C. law firm that was hired by DUPONT as its national coordinating counsel.  Its lawyers have also been lead counsel in certain Benlate cases.

28. TODD R. DAVID is an attorney and partner at ALSTON & BIRD.  Mr. DAVID was one of the attorneys representing DUPONT in Bush Ranch.

29. GEORGE A. FRANK is an attorney, and Corporate Counsel for DUPONT in Wilmington, Delaware.

30. RICHARD T. FULTON is an attorney and partner at ALSTON & BIRD.  Mr. FULTON was one of the attorneys representing DUPONT in Bush Ranch

31. J. ROBERT GIBSON is a DUPONT Agricultural Products Division Executive.

32. ELIZABETH A. GILLEY is an attorney and partner at ALSTON & BIRD.  Ms. GILLEY was one of the attorneys representing DUPONT in Bush Ranch.

33. BRUCE A. HADLEY is a research manager at DUPONT.  Since 1991, Dr.

7

HADLEY has been on special assignment responsible for investigations into Benlate, and a member of the Benlate Resolution Team.

34.  DAVID JOHNSON is a DUPONT analytical chemist who, *inter alia*, provided four to six months of training on analytical chemistry issues to the ALSTON & BIRD attorneys who were involved in the defense of DUPONT in <u>Bush Ranch</u>.

35.  WILLIAM KIRK is a DUPONT Executive.

36.  DOW N. KIRKPATRICK, II, is an attorney, and a partner at ALSTON & BIRD. Mr. KIRKPATRICK was the lead trial attorney for DUPONT in <u>Bush Ranch</u>.

37.  J. KENNARD NEAL is an attorney, and Of Counsel to ALSTON & BIRD.  Mr. NEAL was one of the attorneys for DUPONT in <u>Bush Ranch</u>.

38.  TIMOTHY R. OBRIGAWITCH is the Research Field Operations Supervisor for DUPONT.

39.  ROBERT PETERSON is an employee at ALTA Labs who worked with Robert BETHEM on Benlate claimant soil and water analysis.

40.  POPE, MCGLAMRY, KILPATRICK & MORRISON is the law firm which represented Plaintiffs in <u>Bush Ranch</u>.

41.  GERALD STEPHENSON is a DUPONT employee involved in the Costa Rica field test.

42.  LEON VARGAS is a chemist hired by DUPONT in connection with the Costa Rica field test.

43.  EDGAR S. WOOLARD, JR., is the former president and CEO of DUPONT.

44.  At all relevant times, NICHOLAS ALBERGO, ALSTON & BIRD, ALTA LABS,

8

GLEN S. BALDWIN, ROBERT BETHEM, MORRIS A. BAILEY, THOMAS A. BURKE, CROWELL & MORING, TODD R. DAVID, GEORGE A. FRANK, J. ROBERT GIBSON, ELIZABETH A. GILLEY, BRUCE A. HADLEY, DAVID JOHNSON, WILLIAM KIRK, DOW N. KIRKPATRICK, J. KENNARD NEAL, TIMOTHY R. OBRIGAWITCH, ROBERT PETERSON, GERALD STEPHENSON, and EDGAR S. WOOLARD, JR. were DUPONT's agents and joint venturers acting within the course and scope of their agency or joint venture, and each of their acts and omissions were authorized by DUPONT and ratified by DUPONT. The above individuals were also DUPONT'S co-conspirators.

<u>FACTS COMMON TO ALL CLAIMS</u>

45.  This action arises in part out of the successful efforts of Defendant DUPONT to defraud Benlate claimants, including Plaintiffs herein, during litigation which took place throughout the United States, including in the State of Florida. Specifically, the improper conduct of this Defendant centers around the illegal withholding of vital scientific data and information generated by: 1) these Defendant's agent, ALTA Laboratories, 2) DUPONT itself, and 3) other agents of DUPONT. The data was central to Plaintiffs' claims. It was data that was required to be turned over to Plaintiffs through their counsel or other Benlate claimants (which would have been shared with Plaintiffs' lawyers at Sheehe & Vendiltelli) but was wrongfully, illegally, and fraudulently withheld. The withholding of this data was part of a fraudulent scheme to diminish or extinguish DUPONT's legal liability for damages suffered by these Plaintiffs and thousands of nurserymen like them as a result of a defective, contaminated fungicide called Benlate which DUPONT manufactured and sold. These multiple acts of fraud and deception are in part chronicled in orders issued by Judge Elliott of the Federal District Court

9

in Columbus, Georgia, and Judge Ibarra of the Circuit Court for the Third Circuit, State of Hawaii, in which these two Courts found as a fact that DUPONT perpetrated fraud in numerous ways upon their respective courts and Plaintiffs herein, directly and by implication. True and correct copies of said orders are attached hereto as Exhibits "A" and "B".

46. The Plaintiffs filed products liability lawsuits against DUPONT in 1992.

47. The instant Plaintiffs' cases against DUPONT were, as a result of the fraud by Defendant, circumstantial. Their special damages claims were substantial and they were fraudulently induced to settle for a small fraction of what would have otherwise been a reasonable settlement value, giving up entirely their claims for, inter alia, punitive damages. These plaintiffs have each been damaged in amounts exceeding the jurisdictional limits of this honorable court.

48. Had they known that DUPONT itself and its agents had: (1) proof of deadly SU's in Benlate claimants' soils; (2) massive proof of deadly contaminants in the Benlate itself; and (3) proof from DUPONT's own field tests that Benlate harmed and killed plants, their entire case would have been different, would have been in a much more favorable posture for plaintiffs and would have resulted in a more favorable settlement or judgment for plaintiffs.

49. The following findings of Judge Elliott are accurate: (1) the SU evidence "would have been devastating to the Defendant's case had it been shown that its own experts at ALTA Labs had reached an opposite finding that there were SU's present." The ALTA's test results showed just that. Exhibit "A", pp.17-18; (2) the ALTA evidence would have been "particularly grave" for DUPONT. Exhibit "A", p.20; (3) had the ALTA documents been produced..."The trial of the case may have been materially altered. The presentation of Plaintiffs' witnesses, the

cross-examination of Defendant's witnesses, Plaintiffs rebuttal case, opening statements and closing arguments, at the very least would have been entirely different. Exhibit "A", p.22; (4) "DUPONT's conduct affected the course of Bush Ranch trial from beginning to end -- from opening statement to closing argument." Exhibit "A", p.73.

50.  Defendant's concealment and fraudulent conduct, which had commenced on or before September 1991, continues to the present.  The continuing nature of DUPONT's concealment has deprived plaintiffs of the opportunity promptly to seek appropriate redress for damage that has been done to them.  Plaintiffs have lost the use of the money they deserved as compensation for their loss, and because of that their businesses and they individually continued to be harmed and, in addition, the contamination at their farms could not be cleaned up.  So they continue to suffer as they have since 1988.

51.  Being defrauded has caused Plaintiffs severe emotional distress and has resulted in literally years of additional effort on their parts in seeking justice.

THE BUSH RANCH LITIGATION

52.  The Bush Ranch litigation concerned claims that Benlate 50 DF, a fungicide manufactured by DUPONT, harmed or destroyed plants grown by nurserymen in their businesses, and that Benlate or contaminants present in Benlate had contaminated soil, media, equipment, and structures used by them in their businesses, causing substantial economic damages past and future.  The Bush Ranch plaintiffs retained POPE, McGLAMRY, KILPATRICK & MORRISON ("POPE, McGLAMRY") to represent them in lawsuits against DUPONT, seeking damages for the injuries suffered by them and their businesses.

53.  On behalf of the Bush Ranch plaintiffs, POPE, McGLAMRY filed suit in the Middle

District of Georgia against DUPONT in 1992. These actions were styled <u>Bush Ranch v.</u>
<u>DUPONT</u>, No. 92-33-COL, United States District Court for the Middle District of Georgia,
Columbus Division. In July 1993, the <u>Bush Ranch</u> case became the first Benlate case to go to
trial anywhere in the United States; the first of what was anticipated to be hundreds of such trials.
Because it was the first, and because there were so many others, the <u>Bush Ranch</u> trial was
particularly important to DUPONT.

54. Representatives of the Plaintiffs, including attorneys working with Sheehe &
Vendiltelli were in communication with the <u>Bush Ranch</u> plaintiffs' counsel regarding discovery
in those cases and attended the <u>Bush Ranch</u> trial. Information in the <u>Bush Ranch</u> trial would
have been in the matter of course known to Plaintiffs' lawyers at Sheehe & Vendiltelli.

55. The Plaintiffs specifically relied upon the evidence DUPONT produced in the *Bush
Ranch* trial. In particular, the Plaintiffs specifically relied upon having access to and/or learning
of all evidence produced by DUPONT relating to Benlate 50 DF contamination, field tests using
Benlate, and evidence relating to tests for contaminants, including SUs, found in soils after
Benlate application.

<u>THE ALTA LABS DATA</u>

56. One of plaintiffs' primary theories of liability in <u>Bush Ranch</u> was that Benlate had
been contaminated with extremely potent herbicides (also manufactured by DUPONT) known as
sulfonylureas (SU's). SU's are the most destructive herbicides known to man. They are so
powerful that a fraction of a teaspoonful can kill acres of plants for a number of years. Plaintiffs
alleged that Benlate was contaminated with these herbicides at a plant in Belle, West Virginia
where both the active ingredient of Benlate (benomyl) and the SU's were formulated and/or

stored. DUPONT vigorously denied that this had occurred, and in fact took the false position that it was impossible. For DUPONT, concealing the positive SU findings in the <u>Bush Ranch</u> plaintiffs soil and water, as discussed below, was particularly critical because SU contamination not only established liability; it also explained the continuing harm to the nurseries and dramatically increased their future damages.

57. As part of their discovery in <u>Bush Ranch</u>, the plaintiffs served document production requests on DUPONT, specifically including all documents relating to mass spectrometry testing or analysis relating to the use of Benlate 50 DF. The <u>Bush Ranch</u> Plaintiffs' 1st Request for Production of Documents #18 (served on March 4, 1992) requested the production of: "All documents reflecting, referencing, and/or relating to any analytical findings (including the identification of peaks) from mass spectrometry, infrared spectrometry, ultraviolet spectrometry, gas chromatography, column chromatography, gas-liquid chromatography, thin-layer chromatography, high performance liquid chromatography, and/or affinity chromatography in any way relating to the use and/or administration of Benlate 50 DF..."

58. Request #65 (also served March 4, 1992) requested the production of: "...all documents relating to and/or referencing any report or finding from any person, or entity, whether or not employed by defendant, of other pesticidal compounds, including but not limited to, herbicides, in Benlate 50 DF or any other benomyl-containing fungicide."

59. DUPONT, through ALSTON & BIRD, resisted Plaintiffs' attempts to discover this information, filing objections to the aforementioned requests. Judge Elliott ordered DUPONT to produce the aforementioned documents.

60. By Order dated June 24, 1992, Judge Elliott overruled DUPONT's objections to the

13

Requests for Production of Documents, ordered DUPONT to review its responses to Plaintiffs' requests for production "...and to fully answer each of Plaintiffs' first requests for production of documents within fifteen days from the date of this order."

61. In that same Order, the Court ruled explicitly that in connection with the consolidated discovery, and DUPONT's supplemental responses to it, DUPONT must provide all documents or copies of documents received by or contained in the files of any and all of its retained or employed experts, consultants, attorneys, insurance carriers, and insurance adjusters, in addition to documents in DUPONT's own files. In that same Order, the Court specifically overruled DUPONT's objections to producing documents involving Benlate claims, lawsuits and tests DUPONT had conducted since March 1991, with only DUPONT's claims of attorney-client privilege and work product protection remaining for consideration by the Court. The Court ordered DUPONT to document any claim of privilege or work product protection in a detailed log to be submitted to the Court by DUPONT.

62. By formal request pursuant to the Federal Rules of Civil Procedure, on or about May 24, 1993, all Bush Ranch plaintiffs requested the supplementation of DUPONT's previous responses to Plaintiffs' First Request for Production of Documents. DUPONT formally responded to said request for supplementation on or about June 30, 1993. The ALTA documents described below were responsive to this request but were not produced or referenced, despite the Court's previous orders.

63. In an effort purportedly to ascertain whether SU's, the alleged contaminants, were present in soil, media, and water used by the Bush Ranch plaintiffs, (which Plaintiffs were alleging was causing Plaintiffs' damages), DUPONT sought to obtain soil, water and plant tissue

14

samples from the properties of the <u>Bush Ranch</u> plaintiffs. Plaintiffs objected to DUPONT's request to enter upon their land, and refused to permit it unless DUPONT agreed to turn over to Plaintiffs' counsel, <u>inter alia</u>, all documents and raw data generated as a result of the testing and analysis to be performed by DUPONT and/or its agents. (Documents required to be turned over in any event. See above.) Only after, and because, DUPONT, through ALSTON & BIRD, agreed on May 28, 1993, to turn over the aforesaid material to Plaintiffs' counsel (so long as the material was not protected from disclosure by the attorney-client privilege or the work product rule) did Plaintiffs consent to DUPONT's entry upon their land and the removal for testing of their soil, media, and/or water.

64.  DUPONT hired Nicholas Albergo to collect the samples from Plaintiffs' properties, and to forward the samples to ALTA Labs for testing for the presence of SU's.

65.  In June 1993, Mr. ALBERGO, along with Ms. GILLEY and Mr. DAVID, both of ALSTON & BIRD, traveled to Hawaii, entered upon the premises of PLEASONTON CORPORATION, and collected the samples from sites utilized by <u>Bush Ranch</u> Plaintiff WARREN KOBATAKE, pursuant to the agreement made on May 28, 1993. ALBERGO, on instruction from ALSTON & BIRD, sent these soil samples to ALTA Labs of El Dorado Hills, California, for analysis. On information and belief, ALTA Labs was the only, or one of only two, facilities in the United States with the equipment and expertise to conduct the sophisticated tests required to detect SU's in parts per trillion in the soil samples. These tests were done by a Liquid Chromatography/Mass Spectrometry/Mass Spectrometry or LC/MS/MS instrument at ALTA LABS.

66.  Between June 18 and June 26, 1993, ALTA Labs conducted LC/MS/MS analysis of

the soil and water samples collected by ALBERGO with ALSTON & BIRD, including samples taken from the Hawaii properties leased by Bush Ranch Plaintiff WARREN KOBATAKE. Initial analyses showed that the samples taken from the properties of Mr. KOBATAKE and the other Bush Ranch plaintiffs were producing positive findings for the presence of SU's manufactured by DUPONT. Samples taken from Mr. KOBATAKE's properties were showing positive findings of nine SU's manufactured by DUPONT, in amounts as high as 595 parts per trillion. These showings would clearly demonstrate contamination of Benlate and its harmful effects on plants inasmuch as no Bush Ranch plaintiff had used SU's.

67.  Robert Bethem and/or Robert Peterson of ALTA Labs communicated this data to attorneys at ALSTON & BIRD, including Ms. GILLEY, Mr. DAVID and Mr. NEAL, in a telephone conversation or conversations between California and Georgia between June 19 and June 26, 1993, and in summary table documents transmitted via facsimile from California to Georgia between June 19 and June 26, 1993. All participants in the conversation understood that the positive SU findings had the potential to be devastating evidence against DUPONT.

68.  These documents, and ALTA raw data (hundreds of chromatographs and quantitation sheets) generated by ALTA Labs during June 1993, including notes of the telephone conversation(s) referred to above, were documents responsive to Plaintiffs' requests for production #18 and/or #65 set forth above.

69.  DUPONT and ALSTON & BIRD knew of the existence of the documents transmitted via facsimile from ALTA to ALSTON & BIRD referred to above, and DUPONT and ALSTON & BIRD knew or should have known of the existence of other documents at ALTA Labs responsive to requests #18 and #65.

16

70. Notwithstanding this knowledge, in its June 30, 1993 response to the <u>Bush Ranch</u> Plaintiffs' request for supplementation, DUPONT deliberately and intentionally did not produce or offer to produce to plaintiffs any of the aforementioned documents generated by ALTA Labs. This conduct violated 18 U.S.C. Section 1503, the Federal Rules of Civil Procedure, the Court's Orders referred to above and DUPONT's May 28, 1993 agreement.

71. Nor did DUPONT notify Plaintiffs or the Court that it was withholding said documents based on a claim that said documents were protected from disclosure either by the attorney-client privilege or the work product rule (also referred to as the work product privilege). The Court had ordered DUPONT to notify it and Plaintiffs whenever either such privilege was claimed and to submit a privilege log so the Court could decide whether the privilege claim was correct.

72. DUPONT did not submit a privilege log to the Court identifying any of the ALTA documents as privileged.

73. Nor did DUPONT move the Court to reconsider its June 24, 1992 Order compelling complete responses to plaintiffs' requests #18 and #65, including any documents in the possession of DUPONT's attorneys, consultants, and expert witnesses.

74. ALSTON & BIRD and DUPONT understood that ALTA data evidencing the presence of SU's in the <u>Bush Ranch</u> Plaintiffs' soils would strengthen the value of their claims against DUPONT and that the value of other Benlate claimants' claims, including Plaintiffs herein, would be increased as well.

75. Dr. David JOHNSON, a DUPONT analytical chemist, provided four to six months of training to the ALSTON & BIRD attorneys who were involved in the defense of DUPONT in

17

Bush Ranch, including Dow KIRKPATRICK, Elizabeth GILLEY and Todd DAVID.

76. Dr. JOHNSON provided specific educational assistance to ALSTON & BIRD attorneys to explain to them how to analyze soil and water samples for the purpose of litigation. The ALSTON & BIRD attorneys grasped the data fairly rapidly.

77. Dr. JOHNSON assisted Dow KIRKPATRICK, Elizabeth GILLEY and Todd DAVID in defending DUPONT in the Bush Ranch case. During the trial he discussed with said ALSTON & BIRD counsel chromatogram interpretation, detection limits and DUPONT SU's in the soil.

78. During the period from June 16, 1993 to June 26, 1993 Dr. David JOHNSON was at the law office of ALSTON & BIRD in Atlanta, Georgia assisting ALSTON & BIRD counsel in trial preparation on analytical chemistry matters for the upcoming Bush Ranch trial.

79. In a telephone conversation on June 19, 1993 between Robert Bethem and Robert Peterson of ALTA LABS in California and Elizabeth GILLEY, Todd DAVID and Kennard NEAL of ALSTON & BIRD in Atlanta, Georgia, one or more of the ALSTON & BIRD attorneys instructed ALTA, inter alia, to re-test the soil samples to "confirm (defirm) suspected positives." This conduct violated 18 U.S.C. Sections 1503, 1512 and 1343.

80. On June 22, 1993, Robert Peterson of ALTA Labs reported numerous positive SU findings in the soils of all four Bush Ranch claimants to Elizabeth GILLEY of ALSTON & BIRD in a telephone conversation between El Dorado Hills, California and Atlanta, Georgia. Thereafter, summary tables using a "detection limit" of 25 parts per trillion (ppt) were faxed from ALTA to Ms. GILLEY, showing the same positive findings.

81. After the initial positive findings were reported by ALTA, on information and belief,

18

GILLEY communicated these findings to DUPONT. On information and belief, DAVID JOHNSON was aware of the ALTA data and findings. On information and belief, DUPONT and ALSTON & BIRD conspired and agreed between June 19 and June 25 to illegally conceal the positive findings by violating the court's June 24, 1992 Order, Rule 26 of the Federal Rules of Civil Procedure, and the May 28 agreement between ALSTON & BIRD and POPE, McGLAMRY. This conduct violated 18 U.S.C. Section 1503.

82. On June 25, 1993, Elizabeth GILLEY told Robert Bethem in a telephone conversation to change the format of the summary tables and to raise the "detection limit" from 25 ppt to 50 ppt. Bethem agreed to do so and did so. This conduct violated 18 U.S.C. Sections 1503, 1512 and 1343.

83. At the time, ALSTON & BIRD, DUPONT and ALTA Labs knew that the actual detection limits for SU's in soil tests being conducted by ALTA were significantly below 50 ppt. ALTA's raw data revealed that numerous positive findings for SU's in soil were identified and quantified at levels below 25 ppt. The detection limit was artificially raised in order to avoid reporting positive findings. This conduct violated 18 U.S.C. Section 1503.

84. On June 26, 1993, ALTA faxed the new 50 ppt "detection limit" summary tables to Nicholas ALBERGO, DUPONT's expert witness in Bush Ranch, in care of Elizabeth GILLEY. That same day, ALBERGO produced the summary tables (but none of the raw data) at his deposition in Bush Ranch. In that deposition, he falsely testified that no SU's were found in the soils of the Bush Ranch plaintiffs at a 50 ppt detection limit. All of this conduct violated 18 U.S.C. Sections 1503 and 1343.

85. Elizabeth GILLEY represented DUPONT at ALBERGO's deposition and did

19

nothing to correct the misrepresentation of fact inherent in ALBERGO's testimony, despite the fact that she knew that ALTA had made numerous positive findings of SU's in the soils of the <u>Bush Ranch</u> plaintiffs. This conduct violated 18 U.S.C. Section 1503.

86.  None of the ALTA raw data was provided to the <u>Bush Ranch</u> plaintiffs despite the above-mentioned court orders requiring it; despite ALSTON & BIRD's agreement, on DUPONT's behalf, that the data would be provided; and despite the fact that the Rules of Court required it. This conduct violated 18 U.S.C. Section 1503.

87.  On August 4, 1993, ALBERGO testified at the <u>Bush Ranch</u> trial. He testified that he had personally discussed ALTA's results with the analytical chemists and that he had personally looked at the data. This testimony was false. Elizabeth GILLEY knew that this testimony was false, and did nothing to correct it. This conduct violated 18 U.S.C. Section 1503.

88.  ALBERGO also testified, in response to questioning from Elizabeth GILLEY, that he was "absolutely confident" there were "no" SU's in the plaintiffs' soils. Elizabeth GILLEY, Todd DAVID and Dow KIRKPATRICK knew this testimony conveyed a false impression to the Court, the jury and the Plaintiffs.

89.  Neither Elizabeth GILLEY, Todd DAVID, Dow KIRKPATRICK nor any other ALSTON & BIRD attorney made any attempt to correct the misrepresentations of fact made to the court and jury by ALBERGO. This conduct violated 18 U.S.C. Section 1503.

90.  DUPONT and ALSTON & BIRD elicited ALBERGO's testimony with full knowledge that it was false and with the intent to defraud the Court, jury and plaintiffs in the <u>Bush Ranch</u> case, other Benlate claimants including plaintiffs herein. This conduct violated 18 U.S.C. Section 1503.

91.  By failing to comply with the Court's discovery orders, DUPONT intentionally withheld the raw data from the plaintiffs in Bush Ranch so that they could accomplish their fraudulent ends.

92.  In so doing, DUPONT committed wire fraud (18 U.S.C. Section 1343), obstructed justice (18 U.S.C. Section 1503), and tampered with witnesses (18 U.S.C. Section 1512), depriving the Bush Ranch Plaintiffs of a fair trial.  Further, by, inter alia, mailing falsely sworn discovery responses to Plaintiffs, they committed mail fraud (18 U.S.C. Section 1341).

93.  As a proximate result of the events alleged herein, the Bush Ranch Plaintiffs were deprived of a fair trial in the Bush Ranch case.  Had they been given access to the ALTA raw data in a timely fashion the data would have been analyzed by Dr. Jodie Johnson, the Bush Ranch plaintiffs' analytical chemical expert, who then would have rendered opinions at the trial that SU's had been found in the soils of the Bush Ranch plaintiffs, which would have proved defect and causation in fact.

94.  At the Bush Ranch trial DUPONT characterized the SU contamination issue as the "critical issue in the case".  As a result of the fraud perpetrated by Defendant, the Bush Ranch Plaintiffs and their attorneys agreed to settle their cases for amounts far below the settlement value that would have been reasonable if the ALTA raw data had been revealed.  Armed with the ALTA raw data, the Bush Ranch Plaintiffs would have obtained a more favorable result, either by settlement or judgment, than they did without such data.

### FRAUD IN LAMBERT v. DUPONT

95.  Following the Bush Ranch trial another Benlate case commenced in State Court in Florida styled as Billy Lambert v. DUPONT.  The plaintiff was represented by Chris Skambis

and DUPONT was represented by Patrick Lee of CROWELL & MORING as well as ALSTON & BIRD. The trial started on September 13, 1993.

96. Prior to the commencement of trial, DUPONT had Lambert's soil analyzed for the presence of SU's. On August 24, 1993, ALTA testing revealed a positive finding for Glean, a DUPONT SU, at 24 ppt.

97. On September 16, 1993, Patrick Lee made an opening statement in the Lambert trial and stated that DUPONT had tested the soil at Lambert's through an outside laboratory, (i.e., ALTA) and that those soil tests "proved conclusively that there are no sulfonylureas, no SU's, no atrazine in the soil..." At the time of that statement, DUPONT knew it was false. This conduct violated 18 U.S.C. Section 1503.

98. During the trial DUPONT had the Lambert soil tested again, on October 14, 1993. The results confirmed the initial finding of the presence of SU's in Lambert's soil. More than a dozen consecutive test results revealed positive findings of SU's in Lambert's soil. This was reported to DUPONT by ALTA during the Lambert trial.

99. In spite of this knowledge, Patrick Lee stated in the closing argument in Lambert that the only reason DUPONT had not brought their analytical chemical expert, Dr. Richard Browner, to testify regarding the ALTA test results was because plaintiffs had not presented testimony on the issue of SU contamination.

100. In truth, the real reason Dr. Browner did not testify was that positive SU findings had been discovered in Lambert's soil.

101. At no time did DUPONT or its attorneys attempt to correct the misrepresentations regarding the Lambert ALTA results to the court or to the plaintiffs. Misrepresenting the

22

Lambert ALTA test results and the reasons for DUPONT's failure to call Dr. Browner as a witness violated 18 U.S.C. Section 1503 and was part of its nationwide scheme to defraud Benlate claimants, including Plaintiffs herein.

### FRAUD IN KAWAMATA AND TOMONO v. DUPONT

102.  At the same time that the Bush Ranch case was in trial, in July of 1993, discovery was underway in two Hawaii Benlate cases which were consolidated for trial in the Third Circuit before Judge Ibarra.  Those cases were styled Kawamata Farms Inc. v. United Agri Products, et al., Civil No. 91-437; and Stanley T. Tomono, et al., v. DuPont, Civil No. 92-247K, (hereinafter Kawamata/Tomono).

103.  As they did with the Bush Ranch case, Plaintiffs' attorneys Sheehe & Vendiltelli were in contact with the plaintiffs' lawyers in Kawamata/Tomono and were aware of what discovery was being produced in that case.

104.  The Kawamata/Tomono Plaintiffs had requested DUPONT to produce all tests related to SU contamination in Benlate.  On July 7, 1993, DUPONT corporate counsel George FRANK testified on behalf of DUPONT at a hearing before Judge Ibarra in the Third Circuit Court in Kealakekua, Hawaii.  The purpose of the hearing was for the court to consider evidence regarding DUPONT's repeated violation of rules of discovery and court orders regarding discovery.

105. Mr. FRANK had been identified by DUPONT as the person in charge of coordinating Benlate litigation in all cases, who would have personal knowledge about the discovery procedures utilized by DUPONT in the Benlate cases, i.e., how to answer interrogatories and requests for production of documents.

23

106. Mr. FRANK was specifically questioned by plaintiffs' counsel about documents responsive to interrogatory No. 1 of plaintiff Tomono's first set of interrogatories, which related to ongoing and completed 1993 testing by DUPONT.  Mr. FRANK testified that "...we have no...ongoing 1993 testing."

107. Mr. FRANK's testimony at the July 7, 1993 hearing in this regard was false.  At the time of Mr. FRANK's testimony, DUPONT had ongoing testing for the presence of DUPONT's SU's in the Bush Ranch plaintiffs' soil through its agent ALTA Laboratories in June and July 1993.  This conduct violated 18 U.S.C. Section 1503.

108. Mr. FRANK was also asked by plaintiffs' counsel in  Kawamata/Tomono why the privilege log submitted by DUPONT in that case contained no reference to any kind of 1993 research, whether by DUPONT and DUPONT consultants or outside counsel.  Mr. FRANK responded, "...you have...been produced those documents...".

109. The statement of Mr. FRANK that the plaintiffs in  Kawamata/Tomono had been produced all such documents as of July 1993 was false.  The plaintiffs in that case did not receive any of the ALTA Bush Ranch raw data until May 17, 1994, almost a year later, after disclosure thereof was ordered by the Supreme Court of Hawaii.

110. Mr. FRANK's inaccurate and misleading testimony regarding the existence of the ALTA Bush Ranch test data was intentional conduct by DUPONT.  Mr. FRANK's testimony was meant to conceal the existence of the Bush Ranch raw data and the evidence of Benlate contamination that it revealed.  Mr. FRANK's testimony was meant to induce the plaintiffs and court in that case to believe that no such documents existed.  This conduct violated 18 U.S.C. Section 1503.

24

111. In fact, as of July 7, 1993, the same day that Mr. FRANK testified, Ms. GILLEY of ALSTON & BIRD received the ALTA Bush Ranch raw data from ALTA Laboratories; data which she and DUPONT knew had been in existence for almost a month.

112. Three years later, the above facts regarding Mr. FRANK's false testimony and DUPONT's knowledge of the ALTA Laboratories raw data prompted Judge Ibarra to find "clear and convincing...evidence that DUPONT committed fraud when Mr. FRANK represented to this court and the plaintiffs that there was no ongoing 1993 testing." Order of the Court, dated August 19, 1996, Exhibit "B", p.39.

113. On May 27, 1993 Judge Ibarra ordered DUPONT to produce "...all records, documents, correspondence and all other related materials pertaining to defendant DUPONT's ongoing and completed 1993 testing regarding Benlate 50 DF and Benlate 50 WP." This order to compel was with respect to plaintiffs' first set of interrogatories, interrogatory No. 21.

114. On June 23, 1993 Judge Ibarra found that DUPONT had failed to comply with his previous discovery order and required DUPONT to produce a response by July 2, 1993. Thereafter, DUPONT failed to comply with the July 2, 1993 deadline regarding interrogatory No. 21 and Judge Ibarra ordered DUPONT to produce all documents responsive to this interrogatory on or before July 19, 1993, with the exception of the responsive documents that pertained to macadamia nuts which were to be produced no later than July 26, 1993. (See Exhibit "B", p.13.)

115. In addition, in plaintiffs' third set of interrogatories, interrogatory No. 5 requested that DUPONT produce "...all research data, reports, tests, investigations, analysis, and all other materials pertaining to the effects of sulfonylurea products and soil relating to recropping

25

problems...". On July 26, 1993 the court ordered DUPONT to respond to the interrogatory and produce all documents responsive thereto no later than August 25, 1993.

116. The ALTA Bush Ranch documents were responsive to plaintiffs' interrogatories Nos. 21 and 5 above.

117. DUPONT failed to produce the Bush Ranch ALTA documents in response to the court orders mentioned herein.

118. The failure to produce the ALTA documents in violation of Judge Ibarra's order was intentional conduct by DUPONT. Judge Ibarra made such a finding in his August 19, 1996 order. (See Exhibit "B", p.15.)

119. Failure to produce the ALTA Bush Ranch documents in violation of three court orders was intentional by DUPONT, and constituted an obstruction of justice in violation of 18 U.S.C. Section 1503.

120. In May 1995, fraud hearings were held before Judge Elliott which provided factual information on which he relied in issuing his order of August 21, 1995. See Exhibit "A". At those hearings, lawyers from ALSTON & BIRD testified regarding whether or not the ALTA Bush Ranch raw data was proffered or produced or used during the Bush Ranch trial.

121. Dow KIRKPATRICK testified at the fraud hearings in May of 1995 that the ALTA raw data was brought to the courtroom as required by Federal Rule of Evidence 1006, so that it was available to be offered in the courtroom on August 4, 1995. Mr. KIRKPATRICK further testified to his belief on August 4, 1993 that DUPONT had offered the ALTA raw data during the Bush Ranch trial, and that such an offer obviously would waive any work product privilege claim pertaining to the documents.

26

122. ALSTON & BIRD attorney Ms. GILLEY testified in the fraud hearings before Judge Elliott in May of 1995. At that time she testified that the ALTA raw data was offered to the plaintiffs on August 4, 1993 during the Bush Ranch trial.

123. In the May 1995 fraud hearings ALSTON & BIRD attorney Todd DAVID testified that during the Bush Ranch trial, when the ALTA summary document was tendered, that amounted to a waiver of the work product privilege.

124. At the same time that DUPONT was waiving the work product privilege with respect to the ALTA Bush Ranch documents in the Bush Ranch trial in July and August of 1993, DUPONT was asserting the work product privilege in Hawaii in Kawamata/Tomono, in order to prevent access to the very same ALTA documents.

125. On November 15, 1993, at a hearing before Judge Ibarra in Kawamata/Tomono, John Lacy, DUPONT's counsel in that case, represented to the Court as follows:

The Court: Now, you argue that the other tests are protected under work product?

Mr. Lacy: That's correct Your Honor.

The Court: Other tests and other litigation?

Mr. Lacy: That's right. And it's not been brought up until this motion.

126. In Kawamata/Tomono, DUPONT submitted a privilege log describing the ALTA Bush Ranch data and claimed that such data was protected by the work product privilege. At the time of this representation, DUPONT had already waived the work product privilege with respect to these documents by its assertions and conduct in the Bush Ranch.

127. DUPONT's representations that the ALTA Bush Ranch data was covered by work product under these circumstances was an intentional misrepresentation, was fraudulent and

27

amounted to an obstruction of justice in violation of 18 U.S.C. Section 1503.

128. On November 15, 1993, DUPONT represented to Judge Ibarra that it had never waived the work product privilege on SU testing conducted at the direction of local counsel in other jurisdictions. At the time this statement was made it was false. DUPONT knew it was false and did nothing to correct the misrepresentation to the court. This was a violation of 18 U.S.C. Section 1503.

129. In January 1994, DUPONT represented to Master Frank Takao, who had been appointed by Judge Ibarra to review the claim of work product with respect to many documents, including the ALTA documents, that "...none of the documents submitted to the Master have ever been produced to another party or introduced or proffered in any other Benlate trial...no documents other than the above were proffered or in any way used in connection with any other Benlate trial." In fact, at the time of this representation, DUPONT had used the ALTA documents in the Bush Ranch trial; and DUPONT claims to have proffered them as well. Thus, the representation to Master Takao was also false, in violation of 18 U.S.C. Section 1503.

130. On February 16, 1994 DUPONT represented to Judge Ibarra "...none of the documents submitted to the Master have ever been produced to another party or introduced or proffered in any other Benlate trial." This statement made by DUPONT was misleading, inasmuch as DUPONT had already waived work product protection as to these documents.

131. DUPONT intentionally concealed from Judge Ibarra the conduct and beliefs of DUPONT's Bush Ranch counsel with respect to the privileged status of, offer of and prior use of the Bush Ranch ALTA documents. Further, DUPONT intentionally withheld this crucial information in an attempt to prevent the disclosure to Kawamata, Tomono, Plaintiffs herein and

28

Judge Ibarra of Benlate soil contamination data disclosed in the ALTA documents which went to the heart of the Kawamata and Tomono cases. Such intentional withholding and intentional misrepresentation was done by DUPONT for the purpose of inducing reliance by Judge Ibarra and the plaintiffs in that case and in other cases around the country on the misrepresentations so that the facts contained in the ALTA raw data could continue to be concealed.

132. The above-described failures to comply with court orders and the intentional misrepresentations to the Court in the Third Circuit, State of Hawaii, were all part of an overall scheme perpetrated by DUPONT and its co-conspirators for the purpose of concealing the damaging contamination evidence that existed in the ALTA documents. This concealment was intended to and did deprive Benlate claimants including Plaintiffs herein of the right to recover fair compensation for the harm they sustained due to Benlate in a timely manner.

### FRAUD IN RITTER-WHITWORTH v. DUPONT

133. Following the Bush Ranch and Lambert trials, another Benlate case commenced in State Court in Florida, styled as Ritter-Whitworth v. DUPONT. The plaintiff was represented by Mike Martin and DUPONT was represented by ALSTON & BIRD. The trial started on January 3, 1994. Sheehe & Vendittelli lawyers were in contact with Mr. Martin as to what discovery had been obtained in Ritter-Whitworth.

134. On information and belief, on or about January 12, 1994 wipe samples obtained in August 1993 from the Belle facility were sent to ALTA Labs to be tested for the presence of SU's. At Belle, both benomyl, the active ingredient of Benlate, and SU's manufactured by DUPONT were present. As was the case in Bush Ranch, Kawamata/Tomono and Lambert, plaintiffs' theory of liability in Ritter-Whitworth included the allegation that cross-contamination

29

of Benlate with the DUPONT SU's had occurred at the Belle facility.  As was the case in <u>Bush Ranch</u>, <u>Kawamata/Tomono</u> and <u>Lambert</u>, DUPONT denied that this had occurred.

135. On information and belief, the wipe samples obtained in August 1993 were obtained from locations at the Belle facility where no SU's should have been present; e.g., in areas where benomyl was being manufactured, and in areas beyond the HEPA filters intended to prevent the egress of any SU's from areas meant to contain them.

136. On information and belief, on or about January 25, 1994, a representative of ALTA informed DUPONT that wipe samples from areas in which benomyl was being manufactured had shown the presence of SU's; and that wipe samples taken downstream from the HEPA filter(s) had also shown the presence of SU's.  These facts were favorable to Plaintiffs' position and adverse to DUPONT's.

137. On information and belief, notwithstanding DUPONT's knowledge of the these facts, DUPONT presented its employee Dale Holstein at the <u>Ritter-Whitworth</u> trial on or about February 1, 1994, to testify, <u>inter alia</u>, that SU's could not contaminate benomyl at Belle; and/or that it was physically impossible for such cross-contamination to have occurred, due to reasons such as separate facilities, equipment, and personnel, and a filter system which completely prevented any contamination by SU's.

138. On information and belief, when it presented Mr. Holstein's testimony, DUPONT knew that it was false, and that ALTA's testing had established that SU's were present in areas in which benomyl was being manufactured, and beyond the HEPA filters.

139. On information and belief, DUPONT did not disclose this information to plaintiffs' counsel in <u>Ritter-Whitworth</u>, or to the court, and instead presented false testimony on this

30

important issue, thereby violating 18 U.S.C. Section 1503. This conduct was in furtherance of DUPONT's nationwide scheme to defraud Benlate claimants so as to defeat or diminish their claims.

140. DUPONT's fraudulent concealment of ALTA data in <u>Kawamata/Tomono Lambert</u>, and <u>Ritter-Whitworth</u> was in part intended to and did in fact prevent Plaintiffs herein from discovering the fraud DUPONT had perpetrated in <u>Bush Ranch</u> and was meant to and did prevent them from seeking redress for such fraud in a timely manner.

141. On information and belief, the cases set forth above are not the only ones in which DUPONT illegally and improperly concealed the ALTA data, in spite of applicable discovery requests, court orders, and court rules.

### DUPONT ILLEGALLY CONCEALED MORE
### EVIDENCE OF CONTAMINATED BENLATE

142. Between 1989 and 1992, DUPONT caused to be conducted and/or was aware of laboratory testing performed by its agents, A&L Labs Midwest, Envirotech, LaPorte, and Terra, on many lots of Benlate manufactured between 1987 and 1991. Some of the lots were tested for the presence of the triazine herbicides atrazine, simazine, cyanazine, and pendimethilin. Others were tested for the presence of the fungicides chlorothalonol and Nustar (a brand name for flusilazole). Literally hundreds of the tests showed the presence of one or more of these substances contaminating hundreds of lots of Benlate. DUPONT knew of the testing and knew of the results. Most of the tests referred to above were completed by the end of 1991. All of the tests referred to above were completed no later than 1992. Most of the results of these tests are set out in Exhibit 9369A in the case of <u>Kawamata Farms, Inc., v. United Agri Products et al.</u>,

31

Civil No. 91-437 (Kona), Circuit Court of the Third Circuit, State of Hawaii.  A true and correct copy of said Exhibit is attached hereto as Exhibit "C". (Note that page 25 and 26 of that exhibit are duplicates.) The documents reporting the tests being referred to herein bear the Bates prefix designations BAM or BPM.

143. The <u>Bush Ranch</u> Plaintiffs' First Request for Answers to Interrogatories, served on or about March 3, 1992, included Interrogatory #49: "Has the presence of any compound with fungicidal activity other than benomyl or methyl-2-benzimidazole carbamate (MBC) been identified in any samples of Benlate 50 DF...that has been subjected to analytical testing by or on behalf of defendant?  If so, identify each and every such compound and state the number of samples of Benlate 50 DF...in which each and every such compound has been identified."

144. DUPONT, through ALSTON & BIRD, resisted the <u>Bush Ranch</u> Plaintiffs' attempts to discover this information, filing objections to the aforementioned requests.  Judge Elliott ordered DUPONT to answer the interrogatory by July 9, 1992.

145. By Order dated June 24, 1992, Judge Elliott overruled DUPONT's objections to the Request for Answers to Interrogatories, and ordered DUPONT "to review its answers to Plaintiffs' first interrogatories after this order is entered and to fully answer each of Plaintiffs' first interrogatories within fifteen days from the date of this order."

146. A truthful response to said interrogatory would have included reference to all the 1989-1991 positive findings set out in Exhibit 9369A for chlorothalonol and Nustar (flusilazole). DUPONT deliberately omitted any reference to these positive findings in answering the interrogatory, attempting to defraud and defrauding the Plaintiffs and the Court, thereby committing the offense of Obstruction of Justice in violation of 18 U.S.C. Section 1503, and mail

32

fraud in violation of 18 U.S.C. Section 1341.

147. In Bush Ranch, Plaintiffs' First Request for Production of Documents, served on or about March 3, 1992, Request #64 sought production of "All documents relating to and/or referencing any report or finding from any person or party, whether or not employed by defendant, of the detectable presence of other compounds with fungicidal activity in any samples assayed of Benlate 50 DF...".

148. DUPONT, through ALSTON & BIRD, resisted Plaintiffs' attempts to discover this information, filing objections to the aforementioned requests. Judge Elliott ordered DUPONT to produce the aforementioned documents.

149. By Order dated June 24, 1992, Judge Elliott overruled DUPONT's objections to the Requests for Production of Documents, ordered DUPONT to review its responses to Plaintiffs' requests for production "...and to fully answer each of Plaintiffs' first requests for production of documents within fifteen days from the date of this order."

150. In that same Order, the Court ruled explicitly that in connection with the consolidated discovery, and DUPONT's supplemental responses to it, DUPONT must provide all documents or copies of documents received by or contained in the files of any and all of its retained or employed experts, consultants, attorneys, insurance carriers, and insurance adjusters, in addition to documents in DUPONT's own files. In that same Order, the Court specifically overruled DUPONT's objections to producing documents involving Benlate claims, lawsuits and tests DUPONT had conducted since March 1991, with only DUPONT's claims of attorney-client privilege and work product protection remaining for consideration by the Court. The Court ordered DUPONT to document any claim of privilege or work product protection in a detailed

33

log to be submitted to the Court by DUPONT.

151. The BAM and/or BPM prefixed documents which recorded, reported, and contained the data and results of the 1989-1991 tests with positive findings for the presence of chlorothanalol or Nustar reflected in Exhibit 9369A were responsive to Request #64, and were required to be produced to Plaintiffs by July 9, 1992.  DUPONT deliberately produced none. Nor did DUPONT list any of them in a privilege log, or in any way notify the Plaintiffs or the Court of the existence of such documents or test results.  This conduct violated 18 U.S.C. Section 1503, and was intended to and did defraud the Plaintiffs and the Court.

152. In Bush Ranch, Plaintiffs' First Request for Production of Documents, Request #63 requested the production of "All documents reflecting, referencing, and/or relating to any tests and/or assays directed at the detection of atrazine in samples of Benlate DF...performed by A&L Laboratories or any other laboratory or entity." Request #65 requested the production of:  "To the extent not already requested, all documents relating to and/or referencing any report or finding from any person, or entity, whether or not employed by defendant, or other pesticidal compounds, including but not limited to, herbicides, in Benlate 50 DF or any other benomyl-containing fungicide."

153. The BAM and/or BPM documents which recorded, reported, and contained the data and results of the 1989-1991 tests with positive findings for the presence of atrazine were responsive to Request #63, and were required to be produced to Plaintiffs by July 9, 1992. DUPONT deliberately produced none.  Nor did DUPONT list any of them in a privilege log, or in any way notify the Plaintiffs or the Court of the existence of such documents or test results. This conduct violated 18 U.S.C. Section 1503, and was intended to and did defraud the Plaintiffs

34

and the Court.

154. The BAM and/or BPM documents which recorded, reported, and contained the data and results of the 1989-1991 tests with positive findings for the presence of atrazine, simazine, cyanazine and/or pendimethilin were responsive to Request #65, and were required to be produced to Plaintiffs by July 9, 1992. DUPONT deliberately produced none. Nor did DUPONT list any of them in a privilege log, or in any way notify the Plaintiffs or the Court of the existence of such documents or test results. This conduct violated 18 U.S.C. Section 1503, and was intended to and did defraud the Plaintiffs and the Court.

155. The <u>Bush Ranch</u> Plaintiffs' First Request for Answers to Interrogatories, served on or about March 3, 1992 included Interrogatory #50: "Has the presence of any compound with herbicidal activity been identified in any samples of Benlate 50 DF...that has been subjected to analytical testing by or on behalf of defendant? If so, identify each and every such compound and state the number of samples of Benlate 50 DF...in which each and every such compound has been identified."

156. A truthful response to said interrogatory would have included reference to all the 1989-1991 positive findings set out in Bates designations BAM and BPM in Exhibit 9369A for atrazine, simazine, cyanazine and pendimethilin. DUPONT deliberately omitted any reference to these positive findings in answering the interrogatory, attempting to defraud and defrauding the Plaintiffs and the Court, and thereby committing the offense of Obstruction of Justice pursuant to 18 U.S.C. Section 1503.

157. By Order dated December 10, 1992, Judge Elliott ordered DUPONT to have its Chief Executive Officer, Edgar S. WOOLARD, Jr., submit an affidavit to the Court by

December 31, 1992, which "shall...state that he has caused inquiry to be made by persons with knowledge and authority as to all documents responsive to Plaintiffs' First Request for Production of Documents and has ordered such person or persons to execute an affidavit or affidavits verifying that all responsive documents have been delivered to the Court and that no responsive documents have been intentionally withheld by the Defendant from production."

158. On January 5, 1993, DUPONT filed in response to the December 10 Order an Affidavit of George A. FRANK. In that affidavit, Mr. FRANK, DUPONT Corporate Counsel assigned to the Benlate litigation, swore that he was "responsible for matters related to DUPONT's defense of the Benlate litigation including the efforts of DUPONT's litigation support team assigned to the Benlate litigation". Mr. FRANK swore that he had the "knowledge to provide the certification required by the Court's December 10 Order." That statement was false, was an attempt to defraud and did defraud Plaintiffs and the Court, and was a violation of 18 U.S.C. Section 1503. Mr. FRANK certified that he did not know of or have any reason to believe that there were any documents responsive to Plaintiffs' First Requests for Production of Documents.

159. By then, all the BAM and BPM documents referred to above were in existence, and Mr. Frank either knew they existed or knew he had insufficient information to give the affidavit set forth above. In either case, the affidavit was false.

160. DUPONT knew that Mr. Frank's affidavit was false yet submitted it with the intention of defrauding the <u>Bush Ranch</u> claimants and other Benlate claimants including Plaintiffs herein.

161. The <u>Bush Ranch</u> Plaintiffs' May 24, 1993 request to supplement also required that

36

this material be produced, and again it was not.

162. On information and belief, DUPONT illegally concealed the BAM and BPM documents in this and other Benlate cases, in spite of applicable discovery requests, court orders, and court rules requiring their disclosure and production.

163. The Bush Ranch Plaintiffs reasonably relied on DUPONT to obey statutes, court orders, court rules, rules of evidence, written agreements, representations to the court by officers of the court, and representations made under oath to the court by DUPONT's officers and agents. They and their attorneys did so rely, and as a result of the fraud set forth above perpetrated by Defendant, Plaintiffs and their attorneys agreed to settle their cases for amounts far below the settlement value that would have been reasonable if the BAM/BPM documents had been revealed.

164. In Kawamata/Tomono in the Third Circuit of the State of Hawaii, DUPONT also wrongfully concealed the test results referred to above showing serious herbicide and fungicide contamination in Benlate. Following is, in part, the way in which these documents were discovered and DUPONT's illegal attempts to keep their secret, long after Bush Ranch.

165. In August and November 1993 Judge Ibarra, of the Third Circuit Court of the State of Hawaii, issued two discovery orders requiring DUPONT to produce documents related to herbicide contamination of Benlate formulated by Defendant Terra, Platt and Bartlo. In response to these orders DUPONT identified a list of documents by Bates numbers that plaintiffs could examine at DUPONT's document depository in Wilmington, Delaware. The list provided by DUPONT did not identify any documents with BAM, BAL or BPM Bates number prefixes.

166. On June 8 and 9, 1994 DUPONT employee Dennis Keeler was deposed in a Florida

Benlate case. He identified three sets of documents with DUPONT BAM, BAL, and BPM Bates number prefixes that contained "nearly 100%" of all contamination test results for Benlate 50 DF. DUPONT had not identified any documents in response to Judge Ibarra's discovery orders.

167. DUPONT had no explanation in Kawamata/Tomono as to why these test results showing contamination in Benlate had not been previously produced or identified.

168. As a sanction, Judge Ibarra admitted into evidence an 84 page summary of the contamination test results for Benlate 50 DF manufactured from 1987 through 1991. That document was plaintiffs' Exhibit 9369A, attached hereto as Exhibit "C".

169. On November 17, 1994 Dennis Keeler testified in Kawamata/Tomono and confirmed that the test results contained in plaintiffs' Exhibit 9369A were accurate. Except for the fact that pages 25 and 26 of Exhibit 9369A were duplicates, that testimony was correct.

170. At the time Judge Ibarra considered entering a default judgment against DUPONT for the intentional concealment of these Benlate contamination documents.

171. In January 1995, near the conclusion of the Kawamata/Tomono trial, Dennis Keeler was again deposed in the Florida case of Smith v. DUPONT. He testified that additional BAM prefix documents showed Atrazine contamination of Benlate packaged by DUPONT's agent Bartlo. These results had not previously been reported and were not included in plaintiffs' Exhibit 9369A. DUPONT contended that this new list of Bartlo contaminated lots had been produced to the plaintiffs in August of 1993 somewhere in 49 boxes of documents produced to plaintiff. However, the documents were not identified in DUPONT's response to interrogatories as being responsive to an interrogatory requesting such test data.

172. Judge Ibarra found that DUPONT's failure to properly identify the BAM documents

in its discovery response was intentional and admitted the list and Keeler's deposition testimony into evidence on the last day of the Kawamata/Tomono trial.

173. The failure to identify the list of Bartlo contaminated lots as lots responding to plaintiffs' interrogatory No. 10 was intentional.  Its purpose was to conceal the document from the plaintiffs in Kawamata/ Tomono and also to conceal such information from all Benlate claimants including plaintiffs herein.

174. Such intentional concealment was a violation of 18 U.S.C. Section 1503 and amounted to an obstruction of justice.

175. After the conclusion of the Kawamata/Tomono trial, information in the Florida Smith v. DUPONT case revealed that DUPONT had concealed even more contamination of Benlate 50 DF at their Bartlo packaging plant.

176. The deposition testimony of Dennis Keeler read to the jury in the Kawamata/Tomono case on January 6, 1995, disclosed two lots of Benlate packaged at Bartlo which were contaminated with atrazine.  However, in the Smith v. DUPONT case, a January 30, 1995 supplemental interrogatory answer disclosed that 34 Bartlo lots had atrazine contamination of 1,000 parts per million or greater.

177. In fact, a DUPONT Blackhawk summary document identified 91 different contaminated Bartlo lots tested at DUPONT's Blackhawk warehouse.  Some of the lots contained as much as 6,500 parts per million of atrazine.

178. This information was withheld by DUPONT from the plaintiffs in the Kawamata/Tomono.

179. The same information was withheld from Plaintiffs herein contrary to court orders

mentioned above in Bush Ranch.

180. Judge Ibarra found that the "...the withholding of this information by defendant DUPONT was intentional." Judge Ibarra amended a previously instituted punitive sanction order and awarded the plaintiffs in Kawamata/ Tomono $48,157.29 in fees and costs. He also reaffirmed and incorporated the $1.5 million fine as a proper sanction for DUPONT's intentional discovery abuse discovered after trial.

181. DUPONT's concealment of the Bartlo test data in Kawamata/Tomono was intentional and fraudulent. It was done by DUPONT for the purpose of concealing the damaging information from the plaintiffs in that case as well as the Plaintiffs herein. The identical information was concealed from the Plaintiffs in Bush Ranch.

182. In Plaintiffs' underlying products liability actions, DUPONT's concealment of the BAM. BAL. and BPM Bates prefixed information continues. For example. Plaintiffs's lawyers Sheehe & Vendittelli asked DUPONT to produce, inter alia, "Any and all documents which set forth the results of testing of Benlate 50 DF by defendants du Pont or its agents during the period January 1, 1986 to the present."

183. DUPONT responses failed to identify the BAM, BAL and BPM Bates prefixed documents, and DUPONT did so with the intention of concealing these tests from Plaintiffs.

184. The concealment of the BAM, BAL and BPM Bates prefixed information was done by DUPONT and its counsel with the intention of defrauding Benlate claimants such as Plaintiffs herein, preventing them from learning the true facts, and inducing Plaintiffs herein and other Benlate claimants to settle their cases for substantially less than their reasonable value. The Plaintiffs herein, without such information, settled their cases for less than fair value. If such

40

information had been provided by DUPONT, Plaintiffs and other Benlate claimants would have obtained a better result by way of settlement or judgment than they achieved. DUPONT's conduct in this regard constitutes a violation of 18 U.S.C. Section 1503 and amounts to an obstruction of justice.

185. DUPONT's fraudulent concealment of triazine herbicide, chlorothalanol and flusilazole contamination referred to above was in part intended to and did in fact prevent Plaintiffs herein from discovering the fraud DUPONT had perpetrated against them in <u>Bush Ranch</u> and was meant to and did prevent them from seeking redress for such fraud in a timely manner.

186. On information and belief, the cases set forth above are not the only ones in which DUPONT illegally and improperly concealed such data, in spite of applicable discovery requests, court orders, and court rules.

THE COSTA RICA FIELD TESTS

187. In addition to illegally withholding the laboratory data referred to above, DUPONT also illegally withheld documents and information regarding testing it had conducted in the field in Costa Rica in 1992. The activity in Costa Rica was part of what DUPONT referred to as field tests done under real-world conditions. DUPONT relied substantially in <u>Bush Ranch</u> and subsequent Benlate trials on what it claimed was an unbroken series of such tests as positively proving that Benlate did not harm plants.

188. In <u>Bush Ranch</u>, Plaintiffs requested and DUPONT was ordered to produce all Benlate-related documents, including all test data from 1992. On March 3, 1992, the <u>Bush Ranch</u> Plaintiffs filed interrogatories and requests for production of documents which asked,

41

inter alia, the following:

189. Interrogatory #25. "Identify by title and/or specific matter, date, location of study or test site, and person(s) conducting the study or test, all studies or tests, including plant bioassays, aimed, in whole or part, at characterizing, quantifying, evaluating and/or assessing the toxicity of benomyl, Benlate 50 DF, and/or any other benomyl-containing fungicide to plants of the same species and/or type at different ages and/or stages of maturity and/or development."

190. Request for Production #36. "To the extent not already requested, each and every document containing, referencing and/or relating to any opinion, evaluation, assessment, test, or study in any way concerning the phytotoxicity of Benlate 50 DF conducted by or on behalf of this defendant or by any other entity which are currently in the possession or under the control of this defendant or any of its subsidiaries or affiliates, domestic and international."

191. Request for Production #37. "To the extent not already requested, each and every document currently in the possession of this defendant or any of its subsidiaries or affiliates, domestic and international, or persons under the control of this defendant or any of its subsidiaries or affiliates, domestic and international, including its attorneys, referencing or relating to any opinion, evaluation, assessment, test, or study in any way concerning the phytotoxicity of Benlate 50 DF which was directed or supplied to any present or former officer or employee of this defendant or any of its subsidiaries or affiliates, domestic and international, which was authored by any consultant or expert retained by or on behalf of this defendant, or any of its subsidiaries or affiliates, domestic and international, or by any person to whom this defendant agreed to contribute or did contribute any fees or expenses."

192. Request for Production #92. "To the extent not already requested, all documents

42

referenced or referred to in defendant's answers to Plaintiffs' first interrogatories."

193. Judge Elliott ordered that all documents responsive to these requests be produced by DUPONT several times during the discovery phase of Bush Ranch.

194. As to any test data DUPONT intended to claim privilege, it was required to specifically identify such data on a privilege log by order of Judge Elliott.

195. Mr. George Frank, DUPONT's corporate counsel, also acknowledged during a hearing before Judge Elliott on August 26, 1992 his understanding that DUPONT was "to provide every single document that has any relationship to any aspect of Benlate, benomyl and related product." This and other statements by DUPONT and Judge Elliott demonstrate that the Court had effectively ordered, and that DUPONT and ALSTON & BIRD understood, that DUPONT was under an obligation to produce all Benlate-related documents, including all the documents identified in this Complaint as having been improperly withheld. DUPONT and ALSTON & BIRD acknowledged this obligation and promised to fulfill it. They are therefore estopped from denying that they were under a legal duty to produce all the documents identified in this Complaint as having been improperly withheld. Even if Judge Elliot had not entered the specific orders referred to in this Complaint, the conduct and representations by DUPONT and ALSTON & BIRD referred to above estop them from denying that they were legally obligated to produce all the documents identified in this Complaint as having been improperly withheld.

196. Further, DUPONT specifically waived any privilege as to its 1992 testing after making numerous public statements as to how such 1992 testing exonerated Benlate. In October and November 1992 DUPONT represented in Bush Ranch its intention to release the 1992

testing data and stated on November 6, 1992 that "DUPONT has released their results to the world."

197. DUPONT, through CEO WOOLARD. also testified that its 1992 tests conclusively proved that Benlate cannot cause the kind of damage reported by claimants across the country, including Plaintiffs.

198. DUPONT, again through CEO WOOLARD on December 23, 1992 and May 14, 1993, and Mr. George FRANK, on January 4, 1993, made under oath representations to Judge Elliott in <u>Bush Ranch</u> assuring Plaintiffs and the Court that all 1992 test data had been produced to Plaintiffs.  Further, in deposition Dr. Bruce HADLEY made the same representation on March 31. 1993 and May 21. 1993 as did Dr. Timothy OBRIGAWITCH on April 28. 1993. and April 29, 1993.

199. DUPONT took out an ad in the Wall Street Journal subsequent to <u>Bush Ranch</u> in which it denied that it had improperly withheld any information or documents.

200. DUPONT's claims that it had produced all documents relating to its 1992 tests were false and DUPONT knew they were false.  This conduct violated 18 U.S.C. Sections 1503 and 1341.

201. DUPONT's claim that all of its 1992 tests exonerated Benlate was false and DUPONT knew it was false.  This conduct violated 18 U.S.C. Section 1503.

202. In fact, at the same time DUPONT was claiming its 1992 field tests exonerated Benlate and months before it gave its word, under oath, in <u>Bush Ranch</u> that all 1992 test documents had been produced, DUPONT knew it had been secretly conducting tests in Costa Rica in 1992 in which Benlate damaged and killed plants.

203. In September 1992, DUPONT hired Richard Welker, Welker Plants, Inc., and Richard Cefalo, a Welker employee, to conduct a field test on ornamental plants, using Benlate, in Costa Rica.

204. On September 5, 1992 DUPONT also had Welker sign an agreement to keep the research secret. The signing of these agreements was witnessed by Dr. Timothy OBRIGAWITCH and copies were sent to DUPONT corporate counsel, Mr. George FRANK.

205. In September 1992 DUPONT sent five (5) representatives, including OBRIGAWITCH, to Costa Rica to set up the test.

206. OBRIGAWITCH brought his own Benlate and purchased Benlate locally for application to the test plants. It was applied in a controlled and monitored situation, as set up by DUPONT.

207. In October 1992, Mr. Cefalo reported to DUPONT by way of OBRIGAWITCH that the plants were dying.

208. OBRIGAWITCH immediately instructed Mr. Cefalo to destroy the plants. This conduct violated 18 U.S.C. Sections 1503 and 1512.

209. Prior to their destruction, however, the damaged plants were photographed and videotaped by and at the direction of GERALD STEPHENSON, another DUPONT employee involved in the Costa Rica field test.

210. Despite the facts of the test, the existence of data confirming the tests and the evidence proving Benlate caused plant damage, DUPONT never produced these documents in Bush Ranch, nor were they ever identified in any Bush Ranch privilege log, nor were they revealed in sworn testimony by any DUPONT employees who were specifically asked about

45

such tests during discovery in 1993 in <u>Bush Ranch</u>.  In fact, not only were they not revealed, their existence was categorically denied, under oath, by DUPONT employees.  DUPONT concealed everything about the tests from the <u>Bush Ranch</u> Plaintiffs, the Court and all other Benlate claimants and falsely represented that all 1992 test documents had been produced.  This conduct violated 18 U.S.C. Sections 1503 and 1341.

211. When the Costa Rica test was uncovered in 1996 in connection with the <u>Davis Tree Farms, Inc. v. DUPONT</u> case filed in Florida, and the deposition of Mr. Cefalo was scheduled, DUPONT went to Costa Rica and attempted to intimidate and/or impede his testimony, in violation of 18 U.S.C. Sections 1503 and 1512.

212. In that case, DUPONT admitted it had waived any work product objection with respect to the 1992 test documents and yet obstructed discovery and refused to produce them even in the face of a court order compelling it to do so and even under threat of a default order. This conduct violated 18 U.S.C. Sections 1503 and 1512.

213. In that same case, DUPONT obstructed the deposition of Leon Vargas, a chemist hired by DUPONT in connection with the Costa Rica field test, by fabricating his witness status so as to arguably allow a claim of privilege only after speaking with him and finding out he intended to tell the truth as damaging as it was to DUPONT.  This conduct violated 18 U.S.C. Sections 1503 and 1512.

214. DUPONT also attempted to impede Vargas's testimony and extracted a confidentiality agreement from him after it was informed the field tests results were damaging to DUPONT.  This violated 18 U.S.C. Sections 1503 and 1512.

215. Once the Costa Rica test was uncovered, DUPONT, in a last ditch effort, mislabeled

and concealed the secrecy agreement and the contract with Welker Plants, Inc., on the privilege log. This conduct violated 18 U.S.C. Sections 1503 and 1512.

216. DUPONT fraudulently claimed that the Costa Rica test was not a test because no one from DUPONT had viewed the results. That was also subsequently proved to be a false claim, when Mr. STEPHENSON was forced -- by his own passport entry -- to admit his trip to Costa Rica was to visually record the plant damage.

217. Plaintiffs propounded document production requests that would have obligated DUPONT to disclose the Costa Rica field tests. DUPONT failed to identify these tests in response to any discovery.

218. DUPONT concealed the Costa Rica test and the documents and evidence associated with it in many other Benlate cases, including Bush Ranch, Kawamata/Tomono, in spite of applicable discovery requests, court orders, and court rules requiring its disclosure. Such concealment was in violation of 18 U.S.C. Section 1503. In addition, due to the cooperation among the plaintiffs' lawyers in Bush Ranch and Kawamata/Tomono with Sheehe and Vendiltelli, such information would have been known to the Plaintiffs.

219. Plaintiffs reasonably relied on DUPONT to obey statutes, court orders, court rules, rules of evidence, written agreements, representations to the court by officers of the court, and representations made under oath to the court by DUPONT's officers and agents. They and their attorneys did so rely, and as a result of the fraud set forth above perpetrated by Defendant, Plaintiffs and their attorneys agreed to settle their cases for amounts far below the settlement value that would have been reasonable if the Costa Rica field test had been revealed.

220. DUPONT's fraudulent concealment of the Costa Rica testing was in part intended to

and did in fact prevent Plaintiffs herein from discovering the fraud DUPONT had perpetrated in Bush Ranch and was meant to and did prevent them from seeking redress for such fraud in a timely manner.

221. Plaintiffs herein, like the Bush Ranch plaintiffs and the other Benlate claimants referred to herein, had suffered damages from using contaminated Benlate. They had filed suit against DUPONT in the Eleventh Circuit Court, State of Florida.

222. Their cases were consolidated for discovery purposes with the other Eleventh Circuit Benlate cases being litigated by Sheehe & Vendiltelli.

223. Plaintiffs through their attorneys, had requested the production of documents and information, pursuant to which DUPONT should have produced the ALTA SU documents, the other lab testing revealing contamination of Benlate and the Costa Rica field test documents. With the exception of a small amount of the other lab contamination testing, none of the above-referenced information was disclosed or provided by DUPONT.

224. The above-referenced evidence was damaging to DUPONT and very helpful to Plaintiffs and would clearly have enhanced their cases.

## INTIMIDATING AND IMPEDING WITNESSES

217. In various litigation of Benlate claims DUPONT obstructed justice, in violation of 18 U.S.C. Section 1503, and tampered with witnesses, in violation of 18 U.S.C. Section 1512, by attempting to intimidate and/or impede witnesses who planned to testify against DUPONT, in addition to the acts described above.

218. During a Florida Benlate trial styled Native Hammock Nurseries, Inc. v. DUPONT, Dr. OBRIGAWITCH, while on a break during trial, and just outside the courtroom, walked up to

48

plaintiffs' expert, Dr. Schneider, and gestured to him by slicing his finger across his throat and said to him "You're going down." This caused Dr. Schneider and others to be concerned for his personal safety, and resulted in a criminal defense attorney being hired by Dr. OBRIGAWITCH and his invoking of the Fifth Amendment in subsequent testimony. OBRIGAWITCH's threat to Schneider was obstruction and/or attempted obstruction of justice, and intimidation of a witness, in violation of 18 U.S.C. Sections 1503 and 1512.

219. In the <u>Asia Pacific v. DUPONT</u> cases in the Third Circuit, State of Hawaii, two of plaintiffs' expert witnesses were former long term employees of Monsanto chemical corporation and were about to testify in a Benlate trial on the island of Hawaii, <u>inter alia</u>, about the defective nature of Benlate and its harmful effect on plants. DUPONT deliberately obstructed or attempted to obstruct justice, and deliberately tampered with, or attempted to tamper with witnesses, in violation of 18 U.S.C. Sections 1503 and 1512, by sending some of its key agricultural chemical people and others to their counterparts at Monsanto to persuade them to pressure these two witnesses into refusing to testify against DUPONT. DUPONT was, in effect, sanctioned for this conduct, which it did not deny, by not being allowed to depose these two key witnesses prior to trial.

220. In connection with the Costa Rica field tests, as previously mentioned, both Cefalo and Vargas were pressured by DUPONT not to testify, again amounting to obstruction and/or attempted obstruction of justice, and tampering with witnesses, in violation of 18 U.S.C. Sections 1503 and 1512.

OTHER EVIDENCE OF SCHEME AND RACKETEERING ACTIVITY

221. By September 26, 1991 insurance coverage for Benlate claims either had been or

49

nearly was exhausted and DUPONT's assets were potentially on the line for Benlate claims.

222.  Meetings were held between DUPONT executives and their attorneys to address this issue.

223.  A September 26, 1991 letter from attorney Thomas BURKE to DUPONT in-house counsel Glen BALDWIN sets forth the strategy DUPONT followed, which begins with the end of real science and the institution of a litigation strategy which preordained supposedly objective test results and involved deceit, denial and attacking its injured customers, all for the purpose of denying them fair compensation.  This conduct violated 18 U.S.C. Section 1341.

224.  BURKE suggested cutting back the scientific effort to discover the cause of the farmers' Benlate problems because DUPONT's identification of the cause would establish the "defect", thereby validating plaintiffs' claims; and because "some judge" somewhere would order it to produce the research.  BURKE also suggested that the best litigation strategy would be for DUPONT to appear to look for, but not find, the cause of its' customers' plant damage.

225.  He further suggested that the next step should be to claim that DUPONT had scientifically proved that Benlate was not the cause of the farmers' plant damage and to blame other factors, to increase the likelihood of a favorable outcome for DUPONT.

226.  By March 11, 1992 DUPONT was clearly following BURKE's suggestion as was evidenced in its "Path Forward" documents dated March 17, 1992, in which DUPONT sets out its strategy.  The stated purpose of the "Path Forward" was not to address the nurserymen's problems, but, rather, "so that DUPONT AG products can minimize the negative impacts of business operations and the financial impact of the recall."

227.  Among the key points were the following "messages": "not willing to communicate

50

information about specifics of ongoing investigation of the 'unknown'; we have continuing research efforts on the 'unknown'; we don't have the answers, we're working on it; no contaminant in product."

228. In that "Path Forward" document sent to key DUPONT executives was the plan to: a) conduct field tests, b) conclude from the field tests that Benlate was not the cause of the farmers' damage, c) claim that DUPONT does not know what the cause of damage is, and d) publicly announce that (preordained) conclusion 7-1/2 months later, in November 1992.

229. On November 5, 1992, DUPONT put on the public presentation planned 7-1/2 months earlier and announced, as planned, we know what it is not, not what it is.

230. In fact, DUPONT's research and laboratory testing between 1989 and November 1992 proved that Benlate was contaminated and that Benlate did harm plants.

231. DUPONT knew the statements it was making about Benlate and its effect on plants were false.

232. William KIRK, a DUPONT executive, publicly announced on November 5, 1992 that Benlate could not cause crop damage. That statement was false and DUPONT knew it was false. That statement was intended to and did in fact defraud Benlate claimants including Plaintiffs herein by leading them to believe that their claims were less valuable than they were. KIRK's statement was meant to induce Plaintiffs herein and other Benlate claimants to settle their claims for less than actual value. As a result such claims were settled for less than actual value.

233. Bruce HADLEY, another DUPONT executive, publicly announced on November 5, 1992 that Benlate did not cause plant damage and that it was not contaminated. Such claims

51

were false and DUPONT knew they were false.  Such statement was intended to and did in fact defraud Benlate claimants including Plaintiffs herein by leading them to believe that their claims were less valuable than they were  HADLEY's statement was meant to induce Plaintiffs herein and other Benlate claimants to settle their claims for less than actual value.  As a result such claims were settled for less than actual value.

234.  Dr. J. Robert GIBSON publicly announced on November 5, 1992 that there were no contaminants in Benlate.  That was false and DUPONT knew it was false.  Such statement was intended to and did in fact defraud Benlate claimants including Plaintiffs herein by leading them to believe that their claims were less valuable than they were.  GIBSON's statement was meant to induce Plaintiffs herein and other Benlate claimants to settle their claims for less than actual value.  As a result such claims were settled for less than actual value.

235.  Like other public statements before and after November 5, 1992, these statements were acts of the conspiracy meant to harm nurserymen and farmers' chances of obtaining a fair recovery for the damage to their businesses and themselves, to keep farmers from making and/or pursuing their claims and to prejudice the public (future jury pools) against nurserymen and farmers, and in favor of DUPONT.  Such attempts were obstructions of justice in violation of 18 U.S.C. Section 1503.

236.  The "Path Forward" document also instructed Bruce HADLEY to "get intelligence on the [plaintiffs'] 'experts' so we're not blind-sided" and to "know your enemies; and instructed Morris BAILEY to "cut them off (publicly)" and "don't share info with them".  In December 1992, Bruce HADLEY, David JOHNSON and Timothy OBRIGAWITCH came to Honolulu to meet with University of Hawaii scientists to discuss DUPONT's research.  At the meeting, Bruce

HADLEY told the University of Hawaii scientists that Benlate was not contaminated with herbicides, and that DBU and BIC were not a problem. At the time of these representations, DUPONT knew that Benlate was in fact contaminated with herbicides, and other fungicides, and that DBU and BIC were a problem. Such misrepresentation impeded the University of Hawaii scientists' efforts to analyze and identify problems caused by Benlate.

237. The conduct of DUPONT and its agents described herein related to the ALTA documents, the Costa Rica field tests, the BAL, BAM and BPM prefixed test results and the intimidation of witnesses were all acts done to implement the scheme set forth in the Burke letter of September 26, 1991 and the March 17, 1992 "Path Forward" document.

## CONCLUSION

238. When DUPONT's conduct is laid bare, when courts and juries make factual findings and issue sanctions and award punitive damages and DUPONT eventually settles claims, it tries to condition those settlements on agreements that would have the effect of undoing and rewriting history and covering up evidence. DUPONT also unethically attempts to take the lawyers who represent the plaintiffs DUPONT settles with out of the pool of available attorneys for other farmers. On information and belief, DUPONT attempts to condition its agreements to settle such cases on the plaintiffs' acquiescence to joining or not opposing motions to vacate and seal findings of fact, orders, and judgments that could greatly expedite litigation elsewhere, save other courts tremendous time and expense, further the administration of justice and assist farmers in proving their claims. DUPONT does so with the purpose of making each future claimant spend hundreds of thousands of dollars and work for years, in the hope they will be intimidated into dropping their claims, settling cheap or not pursuing the claim at all.

53

239. As a result of the fact that Defendant illegally concealed and lied about the above-referenced evidence and because of the effect that concealment had in <u>Bush Ranch</u> and other cases, Plaintiffs settled their cases for far less than their actual losses.

240. Had Plaintiffs and their attorneys been aware of the above-referenced evidence, Plaintiffs would not have settled their cases as they did, but would have insisted on and received more.

241. As a direct and proximate result of Defendant' conduct, Plaintiffs settled their cases for less than their actual value and agreed to dismiss their Benlate claims. They also have continued to suffer both economically and personally as a result of both the inadequate settlement and Defendant' cover-up of their fraudulent conduct. The cover-up delayed and continues to delay Plaintiffs rightful compensation which has damaged them economically and emotionally. It has caused them to expend considerable additional effort and expense to obtain justice as evidenced by the fact of this Complaint.

242. By their plan, DUPONT and its attorneys made it impossible, unfair, unreasonable and unlawful for the Plaintiffs to tender back the proceeds they received in the fraudulent and illegally gained settlement.

243. After the Plaintiffs settled their case, but before DUPONT was forced to produce the ALTA documents, the BAM documents, and the Costa Rica field test information, the Plaintiffs used the settlement proceeds from DUPONT to pay their attorneys' fees, taxes, Benlate remediation costs, and bank loans.

244. The Plaintiffs' delay in discovering the litigation fraud was caused by DUPONT's continued concealment.

245. DUPONT's continued concealment of the subject information after settling, caused the Plaintiffs to be unable to tender back the settlement proceeds.

246. As Judge Elliott, the United States District Court Judge presiding over the Bush Ranch trial and the subsequent hearing on DUPONT's contempt, said in his Order:

> DuPont's "Releases" Defense.
>
> We have heretofore noted that while the *Bush Ranch* jury was deliberating the parties reached the agreement on a settlement, and releases were signed. DuPont has contended that these releases bar the parties instituting this show cause proceeding.
>
> Neither the releases nor the pre-release agreement put in evidence by DuPont bar the Court from considering the fraud on the Court alleged in the petition. No agreement between private parties can deprive the Court of its power to conduct an investigation into and rendering rulings on an alleged fraud upon this Court. *See Hazel-Atlas Glass Co. v. Hartsford Empire Co.*, 322 U.S. 238 (1944); *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946). *See also Glover v. Southern Bell & Telegraph Co.*, 229 Ga. 874, 195 S.E.2d 11 (1972) (release only effective absent fraud). Further, the conduct alleged in the petition and in the memorandum/appendix in support, and the evidence of such conduct heard and seen by this Court, is not conduct "released" by the parties. The language contained in such releases and pre-release agreement does not contain language specifically releasing matters arising from the misconduct alleged. *See U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 27 F.3d 521 (11th Cir. 1994). *See also U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 1004 (11th Cir. 1993).

Thus, the releases signed by the Plaintiffs to settle their products liability suits do not release DUPONT's fraudulent and illegal conduct during the litigation between the parties that induced the Plaintiffs to sign the releases.

247. The Plaintiffs have not waived any cause of action stated hereafter . There is no language of a release document releasing the conduct set forth herein nor does any release state

that any representations, inducements, promises, or agreements or otherwise, not embodied
herein shall be of any force or effect. Simply put, the language of the release does not have a
merger clause covering the conduct before the United States District Court which, *inter alia*,
supports causes of action in fraudulent misrepresentations, fraudulent concealment, fraudulent
nondisclosure of a material fact, fraudulent inducement to settle, and fraud on the court.

### FOR A FIRST CLAIM FOR RELIEF
(Fraud)

248. Paragraphs 1 through 247 are incorporated herein by reference.

249. Defendant had scienter or knowledge of the falsity of the representations above-
described and knowledge of the fraudulent concealments and non-disclosures of material facts
above-mentioned.

250. Defendant had scienter or did knowingly intend to defraud, manipulate and/or
deceive plaintiffs, and other Benlate claimants, and to induce plaintiffs' reliance and to induce
plaintiffs to act to their detriment and to enter into and sign settlement agreements and to agree to
dismiss certain claims relating to use of Benlate.

251. Plaintiffs herein reasonably relied on the statements, conduct, testimony and/or
other representations made by DUPONT and its agents, and reasonably relied on DUPONT and
its agents to obey statutes, court orders, court rules, rules of evidence, written agreements,
representations to the court by officers of the court, and representations made under oath to the
court by DUPONT's officers and agents. Plaintiffs did so rely and were misled and defrauded
and fraudulently induced into settling and dismissing their claims against DUPONT, and have
thereby sustained damage and injury in an amount to be shown at trial, an amount exceeding the

56

jurisdictional threshold of this Honorable Court.

252. The above described conduct by Defendant constitutes fraud.

253. As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

FOR A SECOND CLAIM FOR RELIEF
(Intentional Nondisclosure of Material Fact)

254. Paragraphs 1 through 253 are incorporated herein by reference.

255. Based upon the above, it is clear that DUPONT intentionally concealed material facts including, but not limited to, the ALTA documents, the BAM documents, and the Costa Rica field test information.

256. The purpose of the intentional concealment was to obtain an advantage in the Plaintiffs' underlying lawsuits and/or to benefit DUPONT in the amount of money to be paid in the settlement of the subject claims.

257. The Plaintiffs' subsequent and proximate actual damages are the difference between the amount which was actually paid on the underlying case and the amount of settlement which should have been paid absent the illegal conduct of DUPONT and its attorneys, the Plaintiffs' extreme emotional distress, the loss of use of money and attorneys' fees. Additionally, the Plaintiffs are entitled to punitive damages.

FOR A THIRD CLAIM FOR RELIEF
(Fraudulent Inducement to Settle)

258. Paragraphs 1 through 257 are incorporated herein by reference.

57

259. DUPONT misrepresented material facts, including the existence of and/or true contents of the ALTA documents, BAM documents, and the Costa Rica field tests, to the Plaintiffs during the course of settlement of the Plaintiffs' underlying Benlate products liability lawsuits.

260. DUPONT knew or should have known of the existence of and/or true contents of the ALTA documents, BAM documents, and the Costa Rica field tests.

261. DUPONT intended the Plaintiffs rely and act upon the false representations regarding the existence of and/or true contents of the ALTA documents, BAM documents, and the Costa Rica field tests.

262. The Plaintiffs suffered damages as a direct and proximate result of justifiably relying on DUPONT's statements and representations and/or the statements and representations of DUPONT's attorneys as officers of the court.

FOR A FOURTH CLAIM FOR RELIEF
(Fraud on the Court)
(Independent Action Recognized In FRCP Rule 60(b))

263. Paragraphs 1 through 262 are incorporated herein by reference.

264. The Plaintiffs' settlements with DUPONT were induced by fraudulent concealments, nondisclosures and/or fraud upon the Court.

265. The paragraphs of 1 through 262 are realleged here so as to satisfy any requirement of F.R.C.P. Rule 9 in pleading fraud with specificity.

266. The actions described above set forth a deliberately planned and carefully executed scheme to defraud not only the Plaintiffs, but also the United States District Court and the state court of, inter alia, Florida and Hawaii.

267.  Tampering with the administration of justice in the manner shown hereinabove involves more than an injury to a single litigant.  It is a wrong against the institution set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

268.  The actions set forth above subverted the integrity of the United States District Court and the state courts themselves.  It was perpetrated by officers of the Court so that the judicial process could not function in its fair and impartial manner.

269.  The Plaintiffs herein ask that they be relieved from the settlements in the underlying matters as recognized and allowed in F.R.C.P. Rule 60(b).  Specifically, as set forth above, such judgments and settlements were obtained by fraud upon the Court.

270.  This action survives all settlements, judgments, proceedings, or orders.

271.  The equitable relief requested is that the Plaintiffs be allowed to prove the fraud upon the Court, and as a consequence thereof that the Court order that they be awarded the difference between the settlements received and the settlement values had there been no fraud upon the Court, that sanctions, both in dollars and otherwise, against DUPONT be awarded as the Court shall determine, that attorney's fees be paid, that punitive damages be paid in an appropriate amount, and for such other appropriate relief as the Court shall deem just and proper.  It is further requested that a jury be used for the finding of fraud on the court and damages.

## FOR FIFTH CLAIM OF RELIEF
(Rescission and Damages for Fraud)

272.  Paragraphs 1 through 271 are incorporated herein by reference.

273.  The Plaintiffs and the Court were defrauded into approving the settlement received

59

between the Plaintiffs and DUPONT and to dismiss the case.

274.  DUPONT and its attorneys hid from the Plaintiffs and the Court scientific evidence establishing the presence of SUs in Benlate (*i.e.*, concealment of the ALTA Lab documents), scientific evidence establishing the presence of Triazine herbicides in Benlate (*i.e.*, the concealment of the BAM documents), and the existence of field testing (*i.e.*, the concealment of Costa Rica Field Tests).

275.  DUPONT, and its attorneys also presented false testimony from various witnesses, and illegally argued before the Court and juries that DUPONT had complied with all discovery requests with respect to each of these matters.

276.  Paragraphs 1 through 271 are realleged here so as to satisfy the requirement of F.R.C.P. Rule 9 in pleading fraud with specificity.

277.  The actions of DUPONT, and equities, do not require that there be a tender of benefits by the Plaintiffs in order to rescind and sue in tort for damages.

278.  Based upon DUPONT's conduct in delaying the discovery of the fraudulent concealment, the Plaintiffs disbursed the settlement proceeds to pay attorneys fees, taxes, Benlate remediation costs, and bank loans.

279.  DUPONT's conduct concealing the subject evidence prevented the Plaintiffs from exercising their judgement as to the terms of the settlement.

280.  In fact, under the facts as set forth above, rescission can go to any alleged merger clause in the settlement documents allowing the Plaintiffs to affirm the remainder of the contract and sue for damages for fraud, as the right to affirm and the right to sue in fraud for damages coexist.

281.  The Plaintiffs therefore rescind the settlements and/or any illegal merger clauses therein and sue for fraud as set forth in causes of action above incorporated herein.

### FOR A SIXTH CLAIM FOR RELIEF
(Racketeering in violation of 18 U.S.C. Section 1962(c))

282.  Paragraphs 1 through 281 are incorporated herein by reference.

283.  DUPONT is a "person" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

284.  DUPONT, in conjunction with others, formed an "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c), which enterprise was engaged in and the activities of and which affected interstate commerce during the relevant times.

285.  The conduct of DUPONT and others with respect to the ALTA documents and data; with respect to the intentional concealment of the BAM and BPM documents, as well as the test results identifying contamination in the Bartlo lots described herein; with respect to the Costa Rica testing; and with respect to the intimidating and impeding of witnesses was all done pursuant to a common scheme, plan and design and as part of a pattern of racketeering activity by DUPONT and others for the purpose of defrauding the Benlate claimants including Plaintiffs herein in order to diminish the value of their claims.

286.  The Defendant, ALSTON & BIRD, KIRKPATRICK, GILLEY, DAVID, WOOLARD, OBRIGAWITCH, HADLEY, FRANK, GIBSON, ALBERGO, and BETHEM were each employed by or associated with the enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(l)(B) and 1961(E) and 1961(5) and

1962(c), to wit:

      a.   Multiple acts of mail fraud in violation of 18 U.S.C. Section 1341;

      b   Multiple acts of wire fraud in violation of 18 U.S.C. Section 1343; and

      c.   Multiple acts of obstruction of justice in violation of 18 U.S.C. Section 1503.

      d.   Multiple acts involving tampering with witnesses in violation of 18 U.S.C. Section 1512,

as set forth above.

287.  By reason of the violation of 18 U.S.C. Section 1962 committed by Defendant DUPONT, Plaintiffs sustained damage and injury to their businesses and property in an amount to be shown at trial, an amount exceeding the jurisdictional threshold of this Honorable Court.

FOR A SEVENTH CLAIM FOR RELIEF
(Violation of 18 U.S.C. Section 1962(d) by
Conspiracy to Violate 18 U.S.C. Section 1962(c))

288.  Paragraphs 1 through 287 are incorporated herein by reference.

289.  Defendant conspired to violate 18 U.S.C. Section 1962(c).  Defendant violated 18 U.S.C. Section 1962(d).  By reason of the violation of 18 U.S.C. Section 1962(d) committed by Defendant DUPONT, Plaintiffs sustained damage and injury to their businesses and property in an amount to be shown at trial, an amount far exceeding the jurisdictional threshold of this Honorable Court.

FOR AN EIGHTH CLAIM FOR RELIEF
(Conspiracy)

290.  Paragraphs 1 through 289 are incorporated herein by reference.

291.  The above-described conduct by Defendant constitutes conspiracy.

62

292.  As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

### FOR A NINTH CLAIM FOR RELIEF
(Abuse of Process)

293.  Paragraphs 1 through 292 are incorporated herein by reference.

294.  The above-described conduct by Defendant constitutes abuse of process.

295.  As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

### FOR A TENTH CLAIM FOR RELIEF
(Infliction of Emotional Distress)

296.  Paragraphs 1 through 295 are incorporated herein by reference.

297.  The above-described conduct by Defendant constitutes negligent and/or intentional infliction of emotional distress, proximately causing Plaintiff Louis Chang to suffer extreme emotional distress.

298.  As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

### FOR AN ELEVENTH CLAIM FOR RELIEF

(Interference with Prospective Economic Advantage)

299. Paragraphs 1 through 298 are incorporated herein by reference.

300. The above-described conduct by Defendant constitutes intentional and/or negligent interference with prospective economic advantage.

301. As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

### FOR A TWELFTH CLAIM FOR RELIEF
(Spoliation of Evidence)

302. Paragraphs 1 through 301 are incorporated herein by reference.

303. The above-described conduct by Defendant constitutes spoliation of evidence.

304. As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

### FOR A THIRTEENTH CLAIM FOR RELIEF
(Violation of Florida Deceptive and Unfair Trade Practices Act)

305. Paragraphs 1 through 304 are incorporated herein by reference.

306. The Plaintiffs are consumers in commerce and DUPONT is a corporation carrying on business in the State of Florida, and other States.

307. The Plaintiffs and DUPONT engaged in a public business transaction when the Plaintiffs contracted with DUPONT to purchase Benlate 50 DF and/or Benlate 50 WP and later

asserted claims arising from use of Benlate 50 DF and/or Benlate 50 WP.

308. DUPONT blatantly and intentionally employed deceptive and unfair trade practices when it failed to truthfully disclose known defects with Benlate 50 DF and/or Benlate 50 WP, failed to disclose test results related to Benlate 50 DF and/or Benlate 50 WP, fraudulently and deceptively concealed the truth regarding Benlate 50 DF and/or Benlate 50 WP, fraudulently and deceptively conspired to conceal the truth regarding Benlate 50 DF and/or Benlate 50 WP, and/or fraudulently and deceptively concealed test results and field test results.

309. This offensive activity took place within the context of the consumer marketplace, *i.e.*, DUPONT's nationwide sale of Benlate 50 DF and/or Benlate 50 WP.

310. DUPONT's acts and practices as indicated herein were in the conduct of trade and commerce within the public marketplace.

311. DUPONT knew or should have known, that its actions violated the Plaintiffs rights under their contract and its other wrongful actions as factually alleged herein are in violation of the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201 et seq.

312. DUPONT's acts were offensive to the public policy and the public interest in that the acts complained of demonstrate DUPONT's ability to deceive and misrepresent to the public at large facts regarding transactions and contracts affecting commerce.

313. DUPONT's conduct was unscrupulous, unethical, and oppressive. Such conduct directly and indirectly impacts the public interest and has an adverse affect on the public.

314. The acts and practices of DUPONT have potential for repetition in that DUPONT, upon information and belief, continues to conduct business in the State of Florida and may continue to employ such unfair and oppressive tactics.

315. As a direct and proximate result of DUPONT's actions and/or inactions, the Plaintiffs are entitled to treble damages under the Florida Deceptive and Unfair Trade Practices Act.

316. The Plaintiffs' subsequent and proximate damages are the difference between the amount which was actually paid in the settlement of the underlying case and the amount which would have been the fair settlement value of their cases if the Plaintiffs had not been deceived, their extreme emotional distress, the loss of use of money and attorney's fees.

## PUNITIVE DAMAGES

317. DUPONT acted wantonly, oppressively, with such malice as implies a spirit of mischief or criminal indifference to civil obligations. and engaged in willful misconduct or with that entire want of care which would raise the presumption of a conscious indifference to consequences. by clear and convincing evidence warranting the imposition of punitive damages.

318. As a direct and proximate result of Defendant conduct described herein, Plaintiffs suffered financial losses, including but not limited to settling their cases for substantially less than their true value, extreme emotional distress, lost business opportunities, loss of use of money they should have had, and other damages to be proven at trial.

## DEMAND FOR TRIAL BY JURY

319. The Plaintiffs demand their case be heard by a jury on all issues so triable.

WHEREFORE, Plaintiffs Florida Evergreen Foliage and Louis Chang demand judgment against Defendant, jointly and severally, as follows:

a. General damages in an amount to be determined by the jury;

b. Special damages in an amount to be proven at trial;

66

c.  Punitive damages in an amount to be determined by the jury;

d.  Treble damages;

e.  Equitable relief estopping DUPONT from asserting the releases and orders procured by fraud and/or misrepresentation, or alternatively, such other equitable relief, including recission without the corresponding tender of benefits received, as is deemed appropriate by the Court;

f.  Prejudgment interest;

g.  Costs of investigation and suit;

h.  Attorney's fees; and

i.  Such other relief as the Court deems proper.

LEWIS, BABCOCK & HAWKINS, L.L.P.
A. Camden Lewis
Thomas A. Pendarvis
1513 Hampton Street
Post Office Box 11208
Columbia, South Carolina 29211
(803) 771-8000

MOLLIGAN, COX & MOYER
Stephen T. Cox
John C. Hentschel
703 Market Street, Suite 1800
San Francisco, California 94103
(415) 543-9464

SEAN L. MOORE, ATTORNEY AT LAW

Sean L. Moore
2900 East Oakland Park Blvd.
Third Floor
Ft. Lauderdale, Florida 33306
(954) 564-8446
(954) 564-8666
Florida Bar Number: 250015

Attorneys for the Plaintiffs

Ft. Lauderdale, Florida

September 23, 1998

Motions for admission pro hac vice
to be filed for the following attorneys:

A. Camden Lewis
Mary G. Lewis
Thomas A. Pendarvis
LEWIS, BABCOCK & HAWKINS, L.L.P.
1513 Hampton Street
P.O. Box 11208
Columbia, SC 29211
(803) 771-8000

Stephen T. Cox
David W. Moyer
John C. Hentschel
MOLLIGAN, COX & MOYER
703 Market Street, Suite 1800
San Francisco, California 94103
(415) 543-9464

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET 98 2242 CIV-KING

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS
Florida Evergreen Foliage, et al.

## DEFENDANTS
E.I. DUPONT DE NEMOURS AND COMPANY, a
Delaware corporation.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

A SOUTH - 9242- KING - DUBE

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   DADE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) (954)564-8446
Sean L. Moore, Esq.
2900 E. Oakland Park Blvd. - 3rd Fl.
Fort Lauderdale, FL 33306

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST LUCIE,   INDIAN RIVER,   OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | B☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury – | of Property 21 USC 881 | 28 USC 157 | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | B☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | B☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers | Injury Product Liability | B☐ 650 Airline Regs | ☐ 820 Copyrights | Corrupt Organizations |
| B☐ 152 Recovery of Defaulted | Liability | | B☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | B☐ 690 Other | | Exchange |
| B☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **A LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 881 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 882 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 864 SSID Title XVI | ☐ 883 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 884 Energy Allocation Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| B☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | Accommodations | B☐ 530 General | | ☐ 871 IRS – Third Party | State Statutes |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | A☐ 791 Empl Ret Inc | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | Security Act | | *A OR B |
| | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

USC1964, 28USC1331 d 1332.

84 Statute 922 (RICO). Racketeering activities perpetrating a fraud on
Plaintiffs and the Court system to deprive Plaintiffs of just compensation.

LENGTH OF TRIAL
via 7 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $
In excess of 75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   9/23/98

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # 5145-78   AMOUNT 150 00   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___

9/25/98